**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 19-1552 (ABJ) |
| U.S. DEPARTMENT OF JUSTICE, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND RENEWED MOTION TO DISMISS
AND CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ………………………………………………………….. 1

BACKGROUND ……………………………………………………………… 2

ARGUMENT …………………………………………………………….... 9

I.   The Withheld Documents are Neither Pre-Decisional Nor Deliberative  and
     Therefore Do Not Fall Within the Scope of Exemption 5 ................................... 9

     A.   The documents at issue are not predecisional ………………………… 10

     B.   The two withheld documents are not deliberative ……………………14

     C.   DOJ has not demonstrated foreseeable harm from disclosure of
          the two documents ………………………………………………………16

II.  The Attorney Client Privilege Does Not Protect the Two Documents at
     Issue From Disclosure ………………………………………………………… 18

III. The Court Need Not Rule on Defendant's Motion to Dismiss Claim Two ……. 20

CONCLUSION ……………………………………………………………… 21

## TABLE OF AUTHORITIES

**Cases**

*Animal Welfare Inst. v. Nat'l Oceanic & Atmospheric Admin.*, 370 F. Supp. 3d 116  (D.D.C. 2019)……………………………………………………………………………………9

*Brinton v. Dep't of Justice*, 636 F.2d 600 (D.C. Cir. 1980)…………………………………… 19

*Cause of Action Institute v. U.S. Dep't of Justice*, 330 F. Supp. 3d 336 (D.D.C. 2018)……….. 18

*Center for Investigative Reporting v. U.S. Customs & Border Protection*, 436 F. Supp. 3d 90 (D.D.C. 2019)………………………………………………………………………………….. 16

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ................ 10, 14, 18

*CREW v. U.S. Dep't of Justice* , 746 F.3d 1082 (D.C. Cir. 2014)…………………………………9

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*, 442 F. Supp. 3d 37 (D.D.C. 2020)……1, 15, 17

*Fisher v. United States*, 425 U.S. 391 (1976)…………………………………………………... 18

*Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1 (D.D.C. 2000)....................................... 14

*In re Kellogg Brown & Root, Inc.*, 756 F.3d 754 (D.C. Cir. 2014)…………………………… 18

*In re Lindsey*, 148 F.3d 1100 (D.C. Cir. 1998)………………………………………………… 19

*Jimenez v. FBI*, 938 F. Supp. 21 (D.D.C. 1996) ........................................................................ 14

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93 (D.D.C. 2019)………….. 16

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 926 F. Supp. 2d 121 (D.D.C. 2013) 18, 19

*Judicial Watch, Inc. v. U.S. Dep't of Justice*, 2019 WL 4644029 (D.D.C. Sept. 24, 2019)……. 17

*Milner v. U.S. Dep't of Navy*, 562 U.S. 562 (2011)……………………………………………….9

*Murphy v. Exec. Office for U.S. Attys.*, 789 F.3d 204 (D.C. Cir. 2015)………………………….9

*N. L. R. B. v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)......................................................... 14

*Quinon v. FBI*, 86 F.3d 1222 (D.C. Cir. 1996)…………………………………………………..20

*Rosenberg v. U.S. Dept. of Defense*, 342 F. Supp. 3d 62 (D.D.C. 2018)……………… 16, 17, 20

*Tax Analysts v. IRS*, 117 F.3d 607 (D.C. Cir. 1997)…………………………………………… 18

*U.S. Dep't of Justice v. Reporters Committee For Freedom of Press*, 489 U.S. 749 (1989)…….. 9

*Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975) ............................................................. 15, 16

*Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768 (D.C. Cir. 1988)…………………..10

**Statutes**

5 U.S.C. § 552(a)(8)(A)(i)………………………………………………………………… 17

5 U.S.C. § 552(b)(5) …………………………………………………………………… 9

28 U.S.C. § 509………………………………………………………………………… 2, 11

28 U.S.C. § 510…………………………………………………………………………… 2, 11

28 U.S.C. § 515………………………………………………………………………… 11

28 U.S.C. § 515(a) …………………………………………………………………………… 2

5 U.S.C. § 552(b)(5) …………………………………………………………………… 7

**Regulations**

28 C.F.R § 600.6 ……………………………………………………………………………… 3

28 C.F.R § 600.7(b) ……………………………………………………………………… 3, 12, 13

28 C.F.R § 600.8(c)………………………………………………………………………3, 4

28 C.F.R § 600.9(a)(3) …………………………………………………………………… 3, 6, 7

28 C.F.R §§ 600.4-600.10 …………………………………………………………………… 3, 11

# INTRODUCTION

On April 18, 2019, the Attorney General of the United States stood before the American people and perpetuated a misinformation campaign by falsely describing the findings of Special Counsel Robert Mueller. To bolster his conclusion that the evidence the Special Counsel developed was not sufficient to establish that President Trump had committed an obstruction-of-justice offense, Attorney General William Barr explicitly referenced his consultation with the Office of Legal Counsel ("OLC"), an office that is no stranger to being cited by the Executive Branch as the definitive word on an issue or interpretation. Preceding Attorney General Barr's press statement was an equally noteworthy letter he sent to Congress on March 24, 2019, purporting to summarize the key findings of the Mueller Report. In fact, that letter also presented a misleading summary of the Special Counsel's findings. The *coup de grace* was a letter the Attorney General released publicly on April 18, 2019, just before making the Mueller Report public, which echoed and expanded on his misrepresentations at his press conference. Taken as a whole, Attorney General Bar's actions have been characterized as "attempts to spin the findings and conclusions of the [Mueller] Report." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*, 442 F. Supp. 3d 37, 48 (D.D.C. 2020).

This lawsuit seeks to expose OLC's role in these efforts, a role the Department of Justice ("DOJ") has fought vigorously to keep secret. Initially DOJ moved to dismiss the complaint for failure to exhaust administrative remedies, arguing against the clear weight of authority. Now DOJ has moved for summary judgment claiming the documents at issue fall within the scope of Exemption 5 of the Freedom of Information Act ("FOIA") and were properly withheld in response to CREW's FOIA request. But the premise for DOJ's invocation of the deliberative process and attorney client privileges to justify the withholdings is fundamentally flawed. OLC

created the documents at issue not to provide legal advice to aid Attorney General Barr in deciding whether to bring a prosecution—a decision that the Attorney General had delegated to Special Counsel Mueller. Instead, OLC's memorandum served to help the Attorney General falsely spin the findings of Special Counsel Mueller into a vindication of President Trump and to sow doubt about and undermine the findings of the Special Counsel. The FOIA offers no protection for those efforts, which are not protected by either the deliberative process privilege or the attorney client privilege and instead reflect the kind of misconduct for which the FOIA was intended to provide an avenue of public access.

## BACKGROUND

The statutory underpinnings to the documents at issue help explain their non-privileged status. The Attorney General may delegate the broad authority that 28 U.S.C. § 509 vests in him to "any other officer, employee, or agency of the Department of Justice." 28 U.S.C. § 510. This includes directing "an attorney specially appointed by the Attorney General" to "conduct any kind of legal proceeding, civil or criminal[.]" *Id.* § 515(a). Pursuant to these authorities, then-Acting Attorney General Rod Rosenstein[1] appointed Robert Mueller as Special Counsel on May 17, 2017, and authorized him to conduct an investigation of the "Russian government's efforts to interfere in the 2016 election" including "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump." Office of the Deputy Attorney General, Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference With the 2016 Presidential Election and Related Matters,

---

[1] Deputy Attorney General Rosenstein served as acting attorney general in this matter due to the recusal of Attorney General Sessions "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States." Attorney General Sessions Statement on Recusal, *Dep't. of Justice Office of Public Affairs*, Mar. 2, 2017, https://www.justice.gov/opa/pr/attorney-general-sessions-statement -recusal.

https://www.justice.gov/opa/press-release/file/967231/download. Acting Attorney General Rosenstein's order expressly authorized the Special Counsel "to prosecute federal crimes arising from the investigation of these matters." *Id.*

His order also stated that some of DOJ's special counsel regulations, 28 C.F.R §§ 600.4-600.10, applied to Special Counsel Mueller. These regulations lay out the Special Counsel's authority and relationship with the Attorney General in greater detail. Specifically,

> [s]ubject to the limitations in the following paragraphs, the Special Counsel *shall exercise, within the scope of his or her jurisdiction, the full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney*. Except as provided in this part, the Special Counsel shall determine whether and to what extent to inform or consult with the Attorney General or others within the Department about the conduct of his or her duties and responsibilities.

28 C.F.R. § 600.6 (emphasis added). In addition, the regulations provide that the Special Counsel "shall not be subject to the day-to-day supervision of any official of the Department." *Id.* § 600.7(b). Instead, the Attorney General "may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued." *Id.* Upon conclusion of the investigation, the Attorney General must provide the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress with "a description and explanation of instances (if any) in which the Attorney General concluded that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be pursued." *Id.* § 600.9(a)(3). Finally, the regulations provide that "[a]t the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel." *Id.* § 600.8(c). Acting Attorney General

Rosenstein's appointment of Special Counsel Mueller and delegation of authority to him were not rescinded by Acting Attorney General Matthew Whitaker or Attorney General Barr.

On March 22, 2019, Special Counsel submitted his Report to Attorney General Barr "explaining the prosecution or declination decisions [the Special Counsel] reached." Special Counsel Robert S. Mueller, III, Report On The Investigation Into Russian Interference In The 2016 Presidential Election, March 2019 ("Report") Vol. I at 1 (quoting 28 C.F.R. § 600.8(c)). The Report explains that the Special Counsel charged two sets of Russian individuals and/or entities with criminal violations in conjunction with "Russia's two principal interference operations in the 2016 Presidential Election—the social media campaign and the hacking-and-dumping operations." Report, Vol. I at 9.[2] The Special Counsel also disclosed that "while the investigation identified numerous links between individuals with ties to the Russian government and individuals associated with the Trump Campaign, the evidence was not sufficient to support criminal charges." Report Vol. I at 9. The Special Counsel's Office explained that it had charged several individuals affiliated with the Trump Campaign with false statements for lying "to the Office, and to Congress, about their interactions with Russian-affiliated individuals and related matters." Id.[3]

---

[2] See also Indictment, United States v. Netyksho, No. 18-cr-215 (D.D.C. Jul. 13, 2018), https://www.justice.gov/file/1080281/download; Indictment, United States v. Internet Research Agency, No. 18-cr-32 (D.D.C. Feb. 16, 2018), https://www.justice.gov/file/1035477/download.

[3] See also Indictment, United States v. Stone, No. 19-cr-18 (D.D.C. Jan. 24, 2019), https://www.justice.gov/file/1124706/download; Information, United States v. Cohen, No. 18-cr-850 (S.D.N.Y. Nov. 29, 2018), https://www.justice.gov/file/1115596/download; Superseding Criminal Information, United States v. Manafort, No. 17-cr-201 (D.D.C. Sept. 14, 2018), https://www.justice.gov/file/1094141/download; Superseding Indictment, United States v. Manafort, No. 18-cr-83 (E.D. Va. Feb. 22, 2018), https://www.justice.gov/file/1038391/download; Information, United States v. Flynn, No. 17-cr-232 (D.D.C. Nov. 30, 2017) https://www.justice.gov/file/1015026/download; Information, United States v. Papadopoulos, No. 17-cr-182 (D.D.C. Oct. 3, 2017), https://www.justice.gov/file/1007336/download.

As to the President, the Special Counsel relied on the OLC opinion that "'the indictment or criminal prosecution of a sitting President would impermissibly undermine the capacity of the executive branch to perform its constitutionally assigned functions" in violation of 'the constitutional separation of powers.'" Report Vol. II at 1 (quoting *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 2260 (2000)).  The Special Counsel clarified, however, that "if we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state." *Id.* at 2. But "[b]ased on the facts and applicable legal standards" the Special Counsel was "unable to reach that judgment." *Id.* The Special Counsel also made clear that the report "does not exonerate him [President Trump]." *Id.*

The Report contains at least two references to separate memoranda produced to the Acting Attorney General before the Special Counsel sought indictments in conjunction with its investigation. When the Report discusses the Special Counsel's decision to file charges against 13 Russian nationals and three Russian entities in conjunction with the Russian "Active Measures" Social Media Campaign on February 16, 2018, it discloses that "[a] more detailed explanation of the charging decision in this case is set forth in a separate memorandum provided to the Acting Attorney General before the indictment." Report, Vol. I at 174 n.1276. Similarly, when discussing the Special Counsel's decision to file charges against Russian military intelligence officers in conjunction with Russian Hacking and Dumping Operations, the Report discloses that "[t]he Office provided a more detailed explanation of the charging decision in this case in meetings with the Office of the Acting Attorney General before the indictment." Report, Vol. I at 175 n.1277. In addition, when the Report discusses the potential liability of Trump "Campaign-affiliated individuals under federal statutes regulating actions on behalf of, or work

done for, a foreign government," it discloses that "[t]he evidence underlying those charges is not addressed in this report because it was discussed in public court documents and in a separate prosecution memorandum submitted to the Acting Attorney General before the original indictment in that case." Report, Vol. I at 182-83.

By letter dated March 22, 2019, Attorney General Barr informed the Chairs and Ranking Members of the Senate and House Judiciary Committees that Special Counsel Mueller had "concluded his investigation of Russian interference in the 2016 election and related matters."[4] In so doing, Attorney General Barr also provided notice required by 28 C.F.R. § 600.9(a)(3), stating:

> In addition to this notification, the Special Counsel regulations require that I provide you with "a description and explanation of instances (if any) in which the Attorney General" or acting Attorney General "concluded that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be pursued." 28 C.F.R. § 600.9(a)(3). *There were no such instances during the Special Counsel's investigation.*

*Id.* (emphasis added).

Attorney General Barr supplemented this letter two days later with a letter purporting to summarize what Special Counsel Mueller did and did not find.[5] That summary included among other things his statement that the Special Counsel investigation "did not find that the Trump campaign or anyone associated with it conspired or coordinated with Russia" and further that the Special Counsel had "determined not to make a traditional prosecutorial judgment" and "did not draw a conclusion—one way or the other—as to whether the examined conduct constituted obstruction." *Id.* Attorney General Barr also stated that he had determined that "the evidence

---

[4] Barr's letter may be found at https://int.nyt.com/data/documenthelper/708-attorney-general-william-barr-letter-mueller/b7fd3a05ab618bad8544/optimized/full.pdf#page=1.

[5] The March 24, 2019 letter may be found at https://assets.bwbx.io/documents/users/iqj WHBFdfxIU/r.njjovzDF.E/v0.

developed during the Special Counsel's investigation is not sufficient to establish that the President committed an obstruction-of-justice offense," and noted that he expected to be able to advise Congress of the Special Counsel's "principal conclusions" within days. *Id.*

On March 27, 2019, in a letter to Attorney General Barr, Special Counsel Mueller stated that the representations the Attorney General made in his March 24 letter to Congress "did not fully capture the context, nature, and substance" of his office's "work and conclusions."[6] He also noted the "public confusion about critical aspects of the results of [his] investigation" that Attorney General Barr's March 24 letter had caused, which Special Counsel Mueller noted "threaten[ed] to undermine a central purpose for which" DOJ had appointed him: "to assure full public confidence in the outcome of the investigation." *Id.*

On April 18, 2019, Attorney General Barr held a press conference in advance of his release to Congress and the public of the two-volume Report. U.S. Department of Justice News, Attorney General William P. Barr Delivers Remarks on the Release of the Report on the Investigation into Russian Interference in the 2016 Presidential Election, Apr. 18, 2019, https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-release-report-investigation-russian. During that press conference the Attorney General discussed his view that President Trump had not obstructed the Special Counsel's investigation, which he said was made in part after consulting with OLC. *Id.*

On May 29, 2019, in his only public comments up to then as Special Counsel, Special Counsel Mueller announced that his investigation was complete. In those comments, he explained that his office "conducted an independent criminal investigation and reported the

---

[6] That letter can be found at https://apps.npr.org/documents/document.html?id=5984399-Mueller-Letter-to-Barr.

results to the attorney general, as required by department regulations."[7] He further explained that the Report "contains our findings and analysis and the reasons for the decisions we made."[8] Special Counsel Mueller emphasized that "[w]e chose those words carefully, and the work speaks for itself."[9]

> On April 18, 2019, CREW sent a FOIA request by email to OLC requesting
>
> copies of all documents pertaining to the views OLC provided Attorney General William Barr on whether the evidence developed by Special Counsel Robert Mueller is sufficient to establish that the President committed an obstruction-of-Justice offense.[10]

CREW also sought expedition of its request, which DOJ's Office of Public Affairs denied. *See* Ex. C to Colborn Decl.

On May 28, 2019, CREW filed a two-count complaint in this matter. (ECF No. 1). Claim One challenges DOJ's wrongful withholding of the agency records CREW has requested and Claim Two challenges DOJ's failure to grant CREW's request for expedition. Compl., ¶ 20. DOJ moved to dismiss Claim Two and on January 31, 2020, this Court entered an opinion and order denying DOJ's motion. (ECF Nos. 9 and 10). DOJ subsequently conducted a search for responsive records and produced 56 pages of records with redactions and withheld 195 pages in full, as described in the Colborn and Brinkmann Declarations. At this point CREW challenges only the withholding of information in two documents: a March 24, 2019 Memorandum (Document No. 15, attached as Exhibit A to the Declaration of Vanessa Brinkman ("Brinkmann

---

[7] Special Counsel Robert S. Mueller III Makes Statement on Investigation into Russian Interference in the 2016 Presidential Election, *Dep't of Justice Office of Public Affairs* (May 29, 2019) ("Mueller Statement"), https://www.justice.gov/opa/speech/special-counsel-robert-s-mueller-iii-makes-statement-investigation-russian-interference
[8] *Id.*
[9] *Id.*
[10] The request is Ex. B to the Declaration of Paul Colborn ("Colborn Decl.").

Declaration")) and an untitled memorandum shared with the Attorney General (Document No. 6).

## ARGUMENT

### I.     The Withheld Documents are Neither Pre-Decisional Nor Deliberative and Therefore Do Not Fall Within the Scope of Exemption 5.

Exemption 5 of the FOIA permits agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption, like all of the FOIA's exemptions, must be interpreted narrowly, *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal quotation marks and citations omitted),[11] and consistent with the "FOIA's central purpose . . . to ensure that the Government's activities be opened to the sharp eye of public scrutiny[.]" *U.S. Dep't of Justice v. Reporters Committee For Freedom of Press*, 489 U.S. 749, 774 (1989).

Here OLC has relied on the deliberative process privilege to withhold what OLC has identified as Document 6, which the Colborn Declaration describes as "an untitled, undated draft legal analysis prepared by OLC Assistant Attorney General ("AAG") Steven Engel for his use in providing advice within the Department of Justice, Colborn Decl. ¶ 16, and portions of Document 15, a March 24, 2019 memorandum from OLC to the Attorney General. *Id.* at ¶ 17. To satisfy the deliberative process privilege, DOJ must meet two prerequisites: the information it seeks to protect must be both predecisional and deliberate.

A document meets the predecisional requirement if "it was generated before the adoption of an agency policy"; it is deliberative if it "reflects the give-and-take of the consultative

---

[11] *See also Murphy v. Exec. Office for U.S. Attys.*, 789 F.3d 204, 206 (D.C. Cir. 2015); *CREW v. U.S. Dep't of Justice* , 746 F.3d 1082, 1088 (D.C. Cir. 2014); *Animal Welfare Inst. v. Nat'l Oceanic & Atmospheric Admin.*, 370 F. Supp. 3d 116, 131-32 (D.D.C. 2019).

process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2s 854, 866 (D.C. Cir. 1980). As

the D.C. Circuit has explained,

> [t]he deliberative process privilege *does not shield documents that simply state or explain a decision the government has already ma*de or protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations.

*Id.* at 737 (emphasis added). In this way the privilege differentiates between "recommendations,

draft documents, proposals, suggestions, and other subjective documents which reflect the

personal opinions of the writer rather than the policy of the agency"—which fall within the

privilege, *id.* at 866—and "documents which explain an agency's final decision"—which must

be disclosed as non-privileged. *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 774

(D.C. Cir. 1988). Further, "even if the document is predecisional at the time it is prepared, it can

lose that status if it is adopted, formally or informally, as the agency position on an issue or is

used by the agency in its dealings with the public." *Coastal States Gas Corp.*, 617 F.2d at 866.

## A.      The documents at issue are not predecisional.

Applying this precedent here, it is clear that the two withheld documents fail to satisfy the

predecisional requirement. Tellingly, DOJ's declarations contain only vague descriptions of the

purported decision that the withheld documents were antecedent to, underlining this very point.

In describing Document 15, the Colborn Declaration provides only an unredacted sentence from

that memo stating that OLC submitted the memo to the Attorney General to help him determine

> whether the facts set forth in Volume II of Special Counsel Mueller's report 'would support initiating or declining the prosecution of the President for obstruction of justice under the Principles of Federal Prosecution.'

Colborn Decl. ¶ 17 (quoting Document 15, Ex. A to Brinkmann Decl.). The Brinkmann

Declaration is similarly unenlightening; she describes Document 15 as provided to the Attorney

General

> to aid in the Attorney General's decision-making process as it relates to the findings of the SCO investigation, and specifically as it relates to whether the evidence developed by SCO's investigation is sufficient to establish that the President committed an obstruction-of-justice offense.

Brinkmann Decl. ¶ 11. The Colborn Declaration describes Document 6 as an "untitled, undated draft legal analysis" prepared by the head of OLC Assistant Attorney "for his use in providing advice within the Department of Justice." Colborn Decl. ¶ 16.

Both declarations describe a process in search of a decision; neither explains the actual legal decision the Attorney General was considering and the relevance of an assessment of the factual predicate for an obstruction-of-justice prosecution to that decision. This is no accident. By March 24, 2019—the date of the memo at issue (Document 15)—the Special Counsel had completed his work, made his prosecutorial decisions, and submitted his report to the Attorney General, all pursuant to the statutory and regulatory authority conferred on him by 28 U.S.C. §§ 509, 510, 515 and DOJ's special counsel regulations, 28 C.F.R. §§ 600.4-600.1. Prior to finalizing those prosecutorial decisions the Special Counsel had consulted with the Attorney General on at lease three separate occasions. *See* Report, Vol. I at 174 n. 1276, 182-83.

Further, as the Report recounts, the Special Counsel made numerous prosecution and declination decisions during his two-year investigation, which included whether to charge the President with obstruction of justice. Report, Vol. II at 1. On that question the Special Counsel "determined not to make a traditional prosecutorial judgment," but noted that "[b]ased on the facts and applicable legal standards," his office was "unable to reach [the] judgment" that "the President clearly did not commit obstruction of justice[.]" Report, Vol. II at 182. Nevertheless, as the Special Counsel observed, "while [his] report does not conclude that the President committed a crime, it also does not exonerate him." *Id.* Subsequently in testimony before Congress Special

11

Counsel Mueller explained that his decision not to prosecute the President also relied on long-standing DOJ policy. He testified: "We, at the outset, determined that, when it came to the president's culpability, we needed to go forward only after taking into account the OLC opinion that indicated that a sitting president cannot be indicted[.]"[12]

At no time did Attorney General Barr reverse any of the Special Counsel's prosecution decisions, nor did the Attorney General reverse or set aside the OLC opinion barring the prosecution of a sitting president. The Special Counsel regulations authorize the Attorney General to request an explanation for any investigative or prosecutorial step the Special Counsel proposed and to overrule the Special Counsel if the action was "so inappropriate or unwarranted under established Departmental practices that it should not be pursued." 28 C.F.R. § 600.7(b). Attorney General Barr advised Congress in his March 22 letter that "[t]here were no such instances during the investigation."

As these facts and the timeline in this matter make clear, by the time OLC submitted its memo to the Attorney General on March 24, 2019, there were no remaining decisions or actions for the Attorney General to make as to the President and whether or not he had obstructed justice. Nevertheless, the government's brief attempts to place the March 24, 2019 memo in the context of a prosecutorial decision the Attorney General faced. In truth, OLC's views "on the legal question of whether the evidence developed by Special Counsel Mueller was sufficient to establish that the President committed an obstruction of justice offense," Memorandum in Support of Defendant's Motion for Summary Judgment and Renewed Motion to Dismiss ("D's Mem.") at 2, were submitted in a vacuum and were not pertinent to any prosecutorial decision

---

[12] Li Zhou, Why Mueller said he couldn't indict Trump, explained, *Vox*, Jul. 24, 2019, https://www.vox.com/2019/7/24/20708393/robert-mueller-report-trump-olc-justice-department-indictment-charge-sitting-president.

the Attorney General was making. Special Counsel Mueller, the official entrusted with that decision, had reached his conclusion and the Attorney General had declined to take any action to reverse the Special Counsel's conclusions. State differently, there simply was no "'decision-making processes as it [the March 24, 2019 memo] relates to the findings of the [Special Counsel's] investigation' . . . or any other "related prosecutorial decisions[.]" D's Mem. at 14 (quoting Brinkmann Decl. at ¶ 11).

Equally false is DOJ's claim that the views of Principal Associate Deputy Attorney General (PADAG) Edward O'Callaghan, which are reflected in the March 24, 2019 memo, had some special relevance and value that bear on the deliberative nature of the memo because he "had been directly involved in supervising the Special Counsel's investigation and related prosecutorial decisions[.]" D's Mem. at 14. To the contrary, under DOJ regulations, the Special Counsel "shall not be subject to the day-to-day supervision of *any* official of the Department." 28 C.F.R. § 600.7(b) (emphasis added).

Against the weight of this evidence and legally binding agency regulations DOJ offers only the unsupported and inaccurate claim asserted in the Brinkmann Declaration that "any determination as to whether the President committed an obstruction-of-justice offense was left to the purview of the Attorney General." Brinkmann Decl. ¶ 11. As DOJ's own regulations make clear, however, this was a decision within the purview of the Special Counsel, not the Attorney General. Moreover, as Ms. Brinkmann herself attests, however, she is responsible for supervising the FOIA requests her office handles that are subject to litigation, Brinkmann Decl. at ¶ 1, not making a legal determination on the scope of the Attorney General's authority vis-à-vis the Special Counsel or interpreting the DOJ's special counsel regulations. In any event, this Court need not resolve that question—by the time the March 24 memo was shared with the Attorney

General the issue of whether the President should be prosecuted for obstruction of justice was closed.

DOJ has also failed to demonstrate that Document 6—an untitled, undated legal analysis OLC prepared—properly falls within the deliberative process privilege. Without the date the Court has no way of determining whether the memo was pre- or post-decisional. This fact is critical for it explains which side of the clear divide the case law has drawn "between predecisional communications, which are privileged, and communications made after the decision and designed to explain it, which are not" the memo falls. *NLRB v. Sears, Roebuck & Co.*, 41 U.S. 132, 151-52 (1975) (internal citations omitted). *See also Jimenez v. FBI*, 938 F. Supp. 21, 28 (D.D.C. 1996) ("To invoke the deliberative process exemption, the agency must show that the documents (1) precede final agency action on the matter addressed[.]"). Further, without any information on the subject matter of the document the Court also cannot ascertain whether it, in fact, relates to a decision legitimately within the purview of the Attorney General or whether instead it was part of the Attorney General's campaign to undermine the Special Counsel's Report.

### B.    The two withheld documents are not deliberative.

For similar reasons the March 24, 2019 OLC memo also is not a deliberative document. It does not present recommendations or advisory opinions for the Attorney General to consider because there was no prosecution decision under consideration. Instead, it appears to be fodder for the Attorney General's misinformation campaign, which is a far step from a document that "reflects the give-and-take of the consultative process[.]" *Coastal States Gas Corp.*, 617 F.2d at 866. *See also Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1, 7 (D.D.C. 2000) ("[T]he document must be deliberative in nature, *i.e.*, it must be 'a direct part of the deliberative process

in that it makes recommendations or expresses opinions on legal or policy matters.'") (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975)).

Given its timing and the use that the Attorney General made of the information in it, the March 24, 2019 OLC memo falls far short of these requirements. The absence of a pending decision for the Attorney General to make necessarily means the memo did not make a recommendation or express an opinion on a legitimate legal or policy matter. Instead, it was part of a larger campaign initiated by Attorney General Barr to undermine the Special Counsel's report and rehabilitate the President, whose actions led the Special Counsel to conclude he could not state the President had not obstructed justice. Indeed, this is precisely how the court characterized Attorney General Barr's actions in *Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*, 442 F. Supp. 3d at 48: "attempts to spin the findings and conclusions of the [Mueller] Report."

Indeed, documents DOJ produced to CREW in response to the FOIA request at issue (Exhibit A hereto) prove this very point. Far from providing the Attorney General with a formal legal opinion based on its own analysis, OLC drafted the memorandum with significant input from the Deputy Attorney General and others in his office. *See* Exhibit A, pp. 10-20, 35-37. OLC also played an active role in editing the letter the Attorney General was preparing for Congress. *Id.* at 21-34. The two offices were working in tandem to create a narrative to counter the Special Counsel's findings and cast the President in the most positive light possible.

DOJ's contrary arguments rest on the demonstrably false proposition that the memo was submitted to the Attorney General to assist him in making a legitimate decision on whether to initiate or decline prosecution of the President for obstructing justice. D's Mem. at 25. As explained above, however, the Special Counsel already had made final prosecutorial judgments and the time for the Attorney General to challenge those judgments had passed. Whatever the

15

contents of the March 24, 2019 OLC memo, it was not part of a deliberation about whether or not to prosecute the President. While the cases DOJ cites in support do, indeed, stand for the proposition that analysis and recommendations that precede an ultimate determination whether or not to prosecute fall within the deliberative process privilege, D's Mem. at 16, that is not the situation here.

The government's defense of Document 6 suffers from similar flaws. While DOJ claims this document contains "OLC legal advice and analysis," D's Mem. at 13, DOJ offers no description of the deliberative process to which it pertained. Without this information the Court cannot properly conclude that the process to which Document 6 pertains was undertaken in the proper exercise of legal authority the Attorney General actually enjoys, or whether it was part of a larger smear campaign.

### C. DOJ has not demonstrated foreseeable harm from disclosure of the two documents.

The 2015 FOIA Improvement Act codified the "foreseeable harm" standard established administratively in 2009 by then-Attorney General Holder. *Rosenberg v. U.S. Dept. of Defense*, 342 F. Supp. 3d 62, 72 (D.D.C. 2018). The FOIA now provides that "[a]n agency shall . . . withhold information under this section only if . . . (I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or (II) disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). This court has held that this "foreseeable harm" requirement imposes a tougher standard on agencies to meet. *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019) (describing the new foreseeable-harm requirement as a "heightened standard"); *see also Center for Investigative Reporting v. U.S. Customs & Border Protection*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019). To carry "this independent and meaningful burden," *id.*, an agency must "identify specific harms to

the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect[] the harms in [a] meaningful way to the information withheld." *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 2019 WL 4644029, *5 (D.D.C. Sept. 24, 2019). Further, agencies "may take a categorical approach" and "group together like records," *Rosenberg*, 342 F. Supp. 3d at 78, but when doing so, the agency cannot rest on "nearly identical boilerplate statements" and "generic and nebulous articulations of harm." *Judicial Watch*, 2019 WL 4644029, *4-5.

Here, DOJ has offered boilerplate articulations of harm that fail to satisfy the foreseeable harm showing that the FOIA requires. Not only has DOJ not met the required standard, but it also seeks to protect an interest that falls outside those interests legitimately within the protection of FOIA Exemption 5. Specifically, DOJ claims that "compelled disclosure of the withheld documents and material would seriously inhibit the candor and effectiveness of the OLC attorneys engaged in the highly deliberative process of providing legal advice to executive branch clients, including the Attorney General." D's Mem. at 17. This in turn, DOJ alleges, "'would undermine the Attorney General's ability to seek and receive confidential advice from his advisers, including OLC.'" *Id.* (quoting Colborn Decl. at ¶ 23). But the lynchpin of its argument is demonstrably false. The Attorney General was not seeking legal advice from OLC in order to make a prosecution decision—he was seeking support for his efforts to "spin the findings and conclusions of the [Mueller] Report." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*, 442 F. Supp. 3d at 48. Whatever the legality of misrepresenting the Special Counsel's findings to Congress and the public, disclosing further details about those efforts would not cause a foreseeable harm to relevant agency interests that the FOIA is designed to protect. Thus,

the harm DOJ seeks to prevent it is not one "intended to be protected by the deliberative process privilege[.]" D's Mem. at 17.

## II.      The Attorney Client Privilege Does Not Protect the Two Documents at Issue From Disclosure.

As summarized by the D.C. Circuit, "[t]he attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services," and "communications from attorneys to their clients if the communications rest on confidential information obtained from the client." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997). While "not limited to communications made in the context of litigation or even a specific dispute," the attorney client privilege "is narrowly construed." *Coastal States Gas Corp.*, 617 F.2d at 862. Toward that end, "the privilege 'protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege.'" *Id.* (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)). Moreover, "a 'fundamental prerequisite of the privilege' is 'confidentiality both at the time of the communication and maintained since.'" *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 926 F. Supp. 2d 121, 154 (D.D.C. 2013) (quoting *Coastal States Gas Corp.*, 617 F.2d at 863). To meet this prerequisite, the agency bears the burden of showing that it did not share the withheld information with third parties. *Judicial Watch, Inc.*, 926 F. Supp. 2d at 154.

In the government context "DOJ must also establish that securing legal advice was a 'primary purpose' of the agency's communication." *Cause of Action Institute v. U.S. Dep't of Justice*, 330 F. Supp. 3d 336, 347 (D.D.C. 2018) (citing *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759-60 (D.C. Cir. 2014)). As a result, "the privilege does not extend to a 'government attorney's advice on political, strategic, or policy issues, valuable as it may [be].'" *Id.* (citing

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 926 F. Supp. 2d at 144-45 (quoting *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998)).

DOJ has not met its burden here, nor can it. As discussed above, the March 24 memo was not prepared for the purpose of providing legal advice on the sufficiency of the evidence in the Special Counsel Report to support prosecuting the President for obstruction of justice, as DOJ claims. *See* D's Mem. at 18-19. To the contrary, that decision, entrusted to the Special Counsel, already had been made and left undisturbed by the Attorney General. OLC's views were instead sought to assist Attorney General Barr in making a political or strategic decision about how to "spin" the report in a way that placed President Trump in the best light possible, while undermining any contrary conclusion the Special Counsel had reached. As to Document 6, the record lacks sufficient details to conclude that it was prepared for a different purpose than the March 24 memo.

Beyond this fundamental flaw in DOJ's argument, the agency has failed to demonstrate that it did not share the information in the two documents with any third parties. DOJ also has failed to establish that the two documents contain no facts from outside sources, which would not be privileged. *Brinton v. Dep't of Justice*, 636 F.2d 600, 603 (D.C. Cir. 1980). But this Court need not go down that road, as DOJ has failed to make the prerequisite showing that the documents were made for the purpose of providing legal advice to the Attorney General. They were not, and OLC's general role to provide legal advice—the mantra that DOJ repeats in support of its attorney client privilege claim—does not alter this conclusion.

DOJ's policy arguments are equally unpersuasive. Recognizing the attorney client privilege here runs directly counter to the broader public interest. The Attorney General was not acting in the interests "of law and the administration of justice," as Mr. Colborn claims. D's

Mem. at 22-23, citing Colborn Decl. ¶¶ 4, 24. Indeed, Attorney General Barr's actions were directly contrary to the administration of justice. As the Special Counsel wrote in his letter to the Attorney General, the "public confusion about critical aspects of the results of [his] investigation" that Attorney General Barr's March 24 letter had caused "threaten[ed] to undermine a central purpose for which" DOJ had appointed him: "to assure full public confidence in the outcome of the investigation." Thus, while disclosing the withheld documents will cause no foreseeable harm that the FOIA was intended to protect against, allowing DOJ to keep them secret will perpetuate the harm that the Special Counsel fought to prevent.

For all these reasons, DOJ cannot properly rely on Exemption 5 to withhold Document 6 and portions of Document 15. If the Court is not prepared to order disclosure of DOJ's withholdings, it should at least review those withholdings *in camera* to determine whether they satisfy the criteria for properly withholding under Exemption 5. *See Rosenberg*, 342 F. Supp. 3d at 79 (*in camera* review to determine if DOJ met foreseeable harm requirement). The small number of documents at issue makes *in camera* review a preferred option if the Court has remaining questions on the propriety of DOJ's withholdings. *Quinon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996) (number of withheld documents is "important[] factor" in deciding whether to conduct *in camera* review).

### III.    The Court Need Not Rule on Defendant's Motion to Dismiss Claim Two.

Claim Two of the complaint rests on the refusal of DOJ to expedite CREW's FOIA request. The Court already has ruled that DOJ improperly denied expedition and that CREW was not required to exhaust any administrative remedies before bringing suit on this issue. At this point, while DOJ has completed its processing of CREW's request, CREW has been effectively deprived of the benefits of expedition. It was forced to wait many months before DOJ made a

determination on its FOIA request, a delay that deprived CREW and the public of timely access to the requested information.

Unfortunately, the FOIA provides no remedy for stale information. Thus, while DOJ has moved to dismiss Claim Two, CREW no longer contests the issue of expedition that the claim raises. Accordingly, the Court need not rule on DOJ's renewed motion to dismiss.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion for summary judgment, grant Plaintiff's cross-motion for summary judgment, and refrain from ruling on Defendant's motion to dismiss, which is no longer contested.

Dated: September 2, 2020                     Respectfully submitted,

                                                  */s/ Anne L. Weismann*
                                             Anne L. Weismann
                                             (D.C. Bar No. 298190)
                                             6117 Durbin Road
                                             Bethesda, MD  20817
                                             Phone: 301-717-6610
                                             Weismann.anne@gmail.com

                                             Adam J. Rappaport
                                             (D.C. Bar No. 479866)
                                             Citizens for Responsibility and Ethics
                                             in Washington
                                             1101 K Street, N.W., Suite 201
                                             Washington, D.C.  20001
                                             Phone: (202) 408-5565
                                             arappaport@citizensforethics.org

                                             *Attorneys for Plaintiff*

21