IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,<br><br>        Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil No. 19-1552 (ABJ) |

**PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

As Special Counsel Robert Mueller made clear on page one of his report summarizing his obstruction-of-justice-investigation of President Donald Trump, he declined to make what he termed "a traditional prosecutorial judgment" based on an opinion of the Office of Legal Counsel ("OLC") that "'the indictment or criminal prosecution of a sitting President'" would violate separation of powers by "'impermissibly undermin[ing] the capacity of the executive branch to perform its constitutionally assigned functions[.]'" Special Counsel Robert S. Mueller, III, Report On The Investigation Into Russian Interference In The 2016 Presidential Election, March 2019 ("Report") Vol. II at 1 (quoting *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 2260 (2000)). The Special Counsel's role within the Department of Justice ("DOJ") and the regulations that governed him dictated that he not exercise "prosecutorial jurisdiction" over the President. Report, Vol. II at 1. Those same constraints applied equally to Attorney General William Barr, who took no steps to overturn, repudiate, or limit either the OLC opinion or the Special Counsel's decisions.

Nevertheless here, through counter-factual and counter-legal arguments, DOJ attempts to confer on the Attorney General the very prosecutorial jurisdiction he lacks under the OLC opinion. Far from making a decision on whether to prosecute the President, however, the Attorney General was engaged in an effort to rehabilitate President Trump by undermining and mischaracterizing Special Counsel Mueller's investigative evidence that the President had committed illegal acts, including obstruction of justice. The Attorney General's true purpose—reinforced by the legal framework that governed his actions and the dates on which the documents at issue were created—defeats DOJ's reliance on both the deliberative process and attorney client privileges to cover up his actions. At bottom, the real harm from disclosure that DOJ seeks to prevent is public revelation of what the Attorney General in fact was doing and why: obfuscating the overwhelming evidence that the President had obstructed justice on at least several occasions.

As to Count II, it was made moot by DOJ's own actions in the face of this Court's opinion concluding DOJ's denial of expedition "was not the product of reasoned decision making," and that Plaintiff was not required to exhaust administrative remedies before filing suit challenging DOJ's expedition denial. *CREW v. U.S. Dep't of Justice*, 436 F. Supp. 3d 354, 359 (D.D.C. 2020). Under these circumstances, any conclusion by this Court that Count II is now moot should make express that the reasoning of its earlier opinion denying DOJ's motion to dismiss accurately states the law on exhaustion and that DOJ still has not offered a "reasoned decision" to justify denying CREW expedition.

**ARGUMENT**

1. **The Attorney General was not engaged in a decision-making process protected by Exemption 5.**

    a.   *The Attorney General lacked the authority to engage in a prosecutorial decision-making process with respect to the President.*

DOJ argues it is pure speculation that the Attorney General was not engaged in a prosecutorial decision-making process, Def.'s Opp'n to Pl.'s Cross-M. for Summ. J. and Reply ("D's Reply") at 4, ignoring the full record, which includes a binding OLC opinion on the prosecution of a sitting president, governing agency regulations, the explicit findings of the Special Counsel, and the time-frame within which the contested documents were created. Taken as a whole, they demonstrate that Attorney General Barr lacked the authority to make a prosecutorial decision about President Trump.

This case must start with the scope of authority then-Acting Attorney General Rod. J. Rosenstein conferred on the Special Counsel to investigate "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump." Office of the Deputy Attorney General, Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference With the 2016 Presidential Election and Related Matters ("Special Counsel Appointment"), https://www.justice.gov/opa/press-release/file/967231/download. *See United States v. Concord Mgt. & Consulting LLC*, 317 F. Supp. 3d 598, 609 (D.D.C. 2018), *appeal dismissed*, No. 183061, 2018 WL 5115521 (D.C. Cir. Sept. 17, 2018) ("Attorney General establishes the parameters of the Special Counsel's investigation at its outset."). Acting Attorney General Rosenstein directed that specified portions of DOJ's Special Counsel regulations would govern the investigation, specifically 28 C.F.R. §§ 600.4-600.10. Special Counsel Appointment. As a result of the parameters those regulations

established, Special Counsel Mueller was given "the full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney." 28 C.F.R. § 600.6. Further, he was not "subject to the day-to-day supervision of *any* official of the Department." 28 C.F.R. § 600.7(b) (emphasis added). To be sure, as DOJ points out (D's Reply at 7) and this Court noted in *United States v. Manafort*, 312 F. Supp. 3d 60 (D.D.C. 2018), the Special Counsel is subject to the Attorney General's oversight, and "ultimate responsibility" rests with the Attorney General. *Id.* at 70 (quotation omitted). At the same time, however, appointing a special counsel "remov[es] a large degree of responsibility for the matter from the Department of Justice[.]" *Id.*

Governing regulations also constrain the Attorney General's oversight. They specify the action he must take should he conclude that any step by the Special Counsel "is so inappropriate or unwarranted under established Departmental practices that it should not be pursued[.]" *Id.* In that circumstance the regulations direct him to provide the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress at the conclusion of the investigation with "a description and explanation of instances (if any)" where he so concluded. *Id.* § 600.9(a)(3). Significantly, as at least one court has concluded, the Attorney General's power to come to a conclusion that a particular action of the Special Counsel is unwarranted "is not always the power to mandate or countermand the Special Counsel's actions[.]" *Concord Mgt. & Consulting LLC*, 317 F. Supp. 3d at 610. Here, Attorney General Barr informed Congress by letter dated March 22, 2019 that there were no such instances where the Attorney General requested an explanation from the Special Counsel or concluded an action should not be pursued. Pursuant to the governing regulations that notice ended the matter, at least as far as the Attorney General is concerned.

To avoid this conclusion DOJ strings together pieces of the Special Counsel regulations in an attempt to support its argument that Attorney General Barr retained and exercised the ability to determine whether to prosecute a sitting president. For example, DOJ points to 28 C.F.R. § 600.7(b) and reasons that because the Special Counsel declined to make a prosecution decision, the Attorney General had no decision to countermand within the meaning of this regulation, D's Reply at 7, leaving him free to make his own prosecutorial decision. DOJ insists that is precisely what Attorney General Barr did via the decision-making process that produced the documents at issue. A court in this district implicitly rejected the foundation of this assertion, interpreting DOJ's Special Counsel regulations as constraining the Attorney General from countermanding any decision that "does not rise to the level of 'so inappropriate or unwarranted under established Departmental practices.'" *Concord Mgt. & Consulting LLC*, 317 F. Supp. 3d at 612. Here, Attorney General specifically notified Congress that no decision of the Special Counsel rose to that level. As a necessary corollary, there was no further prosecutorial action he could take, even one based on "legitimate reasons," including "the exercise of prosecutorial discretion." *Id.*

This conclusion also accords with DOJ policies, including those expressed through OLC opinions, which governed the Special Counsel and, because he neither repudiated nor modified them, the Attorney General. *Concord Mgt. & Consulting LLC*, 317 F. Supp. 3d at 609 ("Department of Justice policies frame the investigation as it proceeds."). Of greatest significance here, under DOJ policy Special Counsel Mueller lacked the power to indict or criminally prosecute President Trump as a sitting President. According to OLC, such indictment or criminal prosecution would violate separation of powers by "impermissibly undermin[ing] the capacity of the executive branch to perform its constitutionally assigned functions[.]" 24 Op.

O.L.C. 222, 226 (2000). In his report Special Counsel Mueller explained that "for the purpose of exercising prosecutorial jurisdiction" he "accepted OLC's legal conclusion," Report, Vol. II at l, which resulted in him not "mak[ing] a traditional prosecutorial judgment." *Id.* In other words, the Special Counsel understood that under governing DOJ policy as expressed in the OLC opinion he lacked the authority to indict or prosecute the President. He reiterated that this was the principle that governed the investigation when he testified before Congress, stating "[w]e, at the outset, determined that, when it came to the president's culpability, we needed to go forward only after taking into account the OLC opinion that indicated that a sitting president cannot be indicted[.]" Li Zhou, Why Mueller said he couldn't indict Trump, explained, *Vox*, Jul. 24, 2019, https://www.vox.com/2019/7/24/20708393/robert-mueller-report-trump-olc-justice-department-indictment-charge-sitting-president. Because this same policy also constrained the Attorney General, he necessarily could not engage in a prosecutorial decision-making process regarding the President.

> b. *The Attorney General's lack of authority to make a prosecutorial decision is relevant and outcome determinative on the application of Exemption 5.*

DOJ nevertheless insists that not only were the documents at issue prepared to assist the Attorney General in making a prosecutorial decision that fell well within his authority to make, but any evidence that the Attorney General in fact lacked authority to make the decision is "[w]holly [i]rrelevant". D's Reply at 3. DOJ is equally dismissive of the legal constraints that DOJ's own regulations imposed on the Attorney General. But DOJ's skepticism fails to substitute for the law and facts it must present to sustain its burden under the FOIA.

The Supreme Court has explained with respect to the deliberative process privilege that "[m]anifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the

6

quality of agency decisions" and its "focus [is] on documents ''reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975) (citing *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)). Relying on the deliberative process privilege to protect rogue decision makers who act without authority, as DOJ seeks to do here, conflicts directly with the privilege's scope and purpose as DOJ seeks to protect not an agency's decision-making process, but the individual decision maker whose actions are at least suspect, if not *ultra vires*.

Not only is the authority of the decision maker relevant, but also it constitutes a key element of proof as it indicates whether the document in question is deliberative or final. As the D.C. Circuit recognized in *Rockwell Int'l Corp. v.U.S. Dep't of Justice*, 235 F.3d 598 (D.C. Cir. 2001), finality is judged by determining whether the decision of a "responsible decisionmaker in an agency's decision-making process . . . has the practical effect of disposing of a matter before the agency." *Id.* at 602 (quotation and citation omitted). That can only happen if the "responsible decisionmaker" is properly exercising his or her authority.

Unsurprisingly, DOJ offers no case law that supports its remarkable proposition that the Attorney General's lack of authority to make the decision at issue is "wholly irrelevant." Contrary to DOJ's representations, D's Reply at 4, the court's decision in *Competitive Enter. Inst. v. U.S. Dep't of Treasury*, 308 F. Supp. 3d 109 (D.D.C. 2018), undermines—not supports—DOJ's position. There the court upheld the agency's reliance on Exemption 5 in the face of the argument that the agency lacked statutory authority to impose a tax, the subject of the withheld deliberations, because the agency's lack of authority was not clear. *Id.* at 118. But the court contrasted the case before it with other cases where Congress has placed explicit limits on an

7

agency's authority. *Id.* Similarly here, as discussed, DOJ regulations and a binding opinion from OLC make clear the Attorney General had no authority to decide to prosecute the President for obstruction of justice.

Similarly, the decision in *Enviro. Tech Int'l, Inc. v. EPA*, 371 F.3d 370 (7th Cir. 2004), cited in D's Reply at 4, also provides no support for DOJ's invocation of the deliberative process privilege. That court explicitly recognized that "internal discussions about a course of agency action that will be nefarious, if not illegal, likewise would not be protected by the deliberative process privilege." *Id.* at 376. That admonition applies here, where DOJ seeks to manufacture a decision-making process to justify the Attorney General's interference with the Special Counsel and his findings—a goal that defeats, not supports, its reliance on Exemption 5.

    c.    *As a factual matter there was no prosecutorial decision for the Attorney General to make.*

Not only did Attorney General Barr lack the authority to decide whether or not to prosecute the President, but also Special Counsel Mueller already had made a final decision on that matter, which—as explained above—was entrusted to him by Acting Attorney General Rosenstein. Exercising his authority to investigate links between the Russian government and individuals associated with President Trump's campaign, including then-candidate Trump, the Special Counsel reached a conclusion not to "exercise[e] prosecutorial jurisdiction[.]" Report, Vol. II at 1. He explained this conclusion was dictated by "OLC's constitutional view" and a recognition that

> a federal criminal accusation against a sitting President would place burdens on the President's capacity to govern and potentially preempt constitutional processes for addressing presidential misconduct.

*Id.* In other words, Special Counsel Mueller closed the book on prosecuting the President based on binding DOJ policy, leaving nothing for the Attorney General to resolve. In a comparable

8

case, *NLRB v. Sears, Roebuck & Co.*, the Supreme Court concluded that documents "explain[ing] decisions by the General Counsel not to file a complaint are 'final opinions' made in the adjudication of a case and fall outside the scope of Exemption 5." 421 U.S. at 148.

A recent decision of this district, *Electronic Privacy Information Center v. U.S. Dep't. of Justice*, No. CV 19-810 (RBW), 2020 WL 5816218 (D.D.C. Sept. 30, 2020), reinforces this conclusion. At issue were portions of Special Counsel Mueller's Report pertaining to his charging decisions not to prosecute, which included "[t]he elements of the contemplated offenses" and "identities of the individuals against whom those criminal charges were considered but not pursued[.]" *Id.* at *15. In rejecting DOJ's claim that the documents fell within the deliberative process privilege the court explained that the withheld information is not predecisional because it relates to a decision already made. *Id.* at *16. Under DOJ's Special Counsel regulations, 28 C.F.R. § 600.8, the Special Counsel is required to provide the Attorney General with "'a confidential report explaining the prosecution or declination decisions reached by the Special Counsel.'" *Id.* (citing 28 C.F.R. § 600.8). Because the Special Counsel's report explained decisions he already had made, DOJ could not properly withhold those portions of the Report pursuant to the deliberative process privilege. *Id.* Here, too, Special Counsel Mueller's explanation for his prosecutorial decision as to President Trump was final, leaving the Attorney General with no decision to make.[1]

---

[1] Of course, had Special Counsel Mueller decided to prosecute President Trump notwithstanding DOJ policy, the Attorney General could have employed the process spelled out in the Special Counsel regulations and advised Congress of his conclusion that such an action "is so inappropriate or unwarranted under established Departmental practices that it should not be pursued." 28 C.F.R. § 600.9(a)(3). That is not the case here.

9

### 2. DOJ has not satisfied its evidentiary burden to show that the withheld documents are pre-decisional and deliberate.

This dispute concerns two documents: (1) an undated, unsigned so-called legal analysis prepared for an unidentified process ("Document No. 6") that DOJ has withheld in full, and (2) portions of a memo dated March 24, 2019 ("Document No. 15"). The timeline of the events that underlie these two documents disproves their privileged nature, as do facts specific to each.

*a.     Document No. 6.*

Initially DOJ offered few details about Document 6, omitting pivotal facts such as the date it was prepared and the process for which it was prepared. To address these failings, DOJ has proffered a second declaration from Paul Colborn ("2d Colborn Decl."), but it too is short on details that would enable the Court to conclude Document 6 is both pre-decisional and deliberate. While still not dating the document, Mr. Colborn attests that it was prepared "over six months prior to March 2019," 2d Colborn Decl. ¶ 5, which is a far cry from identifying a date certain—or even a year certain—for the document. Nor does Mr. Colborn's latest declaration describe the purpose for which it was prepared beyond stating it was "for Mr. Engel's use in providing advice at the time it was prepared." *Id.* The declaration says nothing about what that use was, the nature of the advice, the decision-making process in which Mr. Engel was involved, and his role in that process—facts that bear directly on whether the deliberative process privilege applies. Without more the Court still cannot ascertain what, if any, relationship the document has to either the Mueller Report or to the Attorney General's so-called deliberations in March, which occurred subsequent to the completion and submission to DOJ of the Mueller Report. Far from clarifying the nature of Document 6, DOJ's latest proffer sows more confusion and highlights the critical missing facts.

As an alternative DOJ offers the "just trust us" defense, making the creative, but ultimately unhelpful argument that simply because DOJ determined Document No. 6 was responsive to CREW's request "makes at least some of the subject matter of the document clear." D's Reply at 8. DOJ bears the burden of proving with facts that the document is deliberative and pre-decisional. *See, e.g., Mead Data Central, Inc. v. Dep't of the Air Force,* 566 F.2d 242, 258 (D.C. Cir. 1977) (government must show "by specific and detailed proof that disclosure would defeat, rather than further, the purposes of the FOIA"); *see also Parke, Davis & Co. v. Califano,* 623 F.2d 1, 6 (6th Cir. 1980) (given the "overwhelming thrust of FOIA ... toward complete disclosure," Exemption 5 claims must be supported with "specificity and [in] detail"). DOJ's self-serving statement that it must be because DOJ says so is no substitute for the specific and detailed facts that DOJ must provide to sustain its burden.

DOJ eschews this burden, claiming instead that the Court must simply defer to its declarations in the absence of "tangible evidence of bad faith[.]" D's Reply at 10 n.4. What DOJ ignores, however, is that its burden includes the requirement to demonstrate that the withheld information "logically falls within the claimed exemption." *Shapiro v. U.S. Dep't of Justice*, 893 F.3d 796, 799 (D.C. Cir. 2018). Applying logic here disproves the applicability of the deliberative process privilege.

Moreover, that Document No. 6 was prepared more than six months before March 24, 2019, is fatal to DOJ's exemption claim. Special Counsel Mueller did not even submit his report to the Attorney General until March 22, 2019, well outside the timeframe in which Document No. 6 was prepared. DOJ simply would have had no occasion six or more months earlier to address the issue of whether the evidence set forth in the Special Counsel's final report supported initiating or declining prosecution of the President for obstruction of justice. If, on the other

hand, Mr. Engel or OLC began working on the legal basis for exculpating President Trump long before Special Counsel Mueller finished his investigation and issued his report, that would reflect an extraordinary effort by the Department of Justice to undercut its own investigation—misconduct that the deliberative process privilege does not protect.

DOJ further claims that because Document No. 6 contains "OLC legal advice and analysis" the deliberative process privilege necessarily protects it. D's Reply at 9. But legal advice in a vacuum, untethered to a particular decision and a timeframe for that decision, does not qualify as either predecisional or deliberative. To meet the predecisional requirement a document must be "generated before the adoption of an agency policy" and to qualify as deliberative it must "reflect[] the give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2s 854, 866 (D.C. Cir. 1980). DOJ has failed to demonstrate that the so-called legal advice in question was provided to Attorney General Barr to assist him in making a decision that legitimately was his to make.

  b.  *Document No. 15.*

DOJ also falls short of satisfying its evidentiary burden with respect to Document No. 15, a memorandum DOJ describes as containing legal advice for the Attorney General. Its arguments rise and fall on its erroneous characterization of the document as providing legal advice and analysis to assist Attorney General Barr in making an agency decision, specifically to "'determin[e] whether the facts set forth in Volume II of Special Counsel's report would support initiating or declining the prosecution of the President[.]'" D's Reply at 11 (quoting Colborn Decl. ¶ 17 (internal quotation omitted)). This so-called decision, however, is an invention of DOJ's, unsupported by any legal authority, to cover up the fact that the Attorney General was engaged in an effort to mislead the public about Special Counsel Mueller's report. The simple

and dispositive fact is that the pursuant to DOJ guidance and the Special Counsel regulations, Attorney General Barr had no authority to prosecute President Trump and therefore no prosecutorial decision to make.

To support its contrary argument, DOJ continues to rely exclusively on the statement of a FOIA supervisor that "the 'determination as to whether the President committed an obstruction-of-justice offense was left to the purview of the Attorney General.'" D's Reply at 12 (quoting Brinkmann Decl. ¶ 11). As CREW demonstrated in its opening brief, however, Ms. Brinkmann is not a competent witness on this matter because her responsibilities as a supervisor of her office's FOIA requests do not include making a legal determination on the scope of the Attorney General's authority vis-à-vis the Special Counsel or interpreting DOJ's Special Counsel regulations. Contrary to DOJ's claim (D's Reply at 12 n.5), her discussions with unidentified "Department personnel" who reportedly are "knowledgeable" about some aspect of what she attests to in her declaration, Brinkmann Decl. at ¶ 3, do nothing to bolster her competency on what essentially are legal issues about the scope of the Attorney General's authority. And while courts generally accept factual assertions in agency declarations that the declarant acquires in the course of his or her official duties concerning the processing of a particular FOIA request, that acceptance does not give a declarant carte blanche to stray into matters of legal interpretation like that presented here concerning the Attorney General's claimed authority to decide whether to prosecute President Trump notwithstanding the conclusions of the Special Counsel, DOJ regulations, and an OLC opinion that bars DOJ from prosecuting a sitting president.[2]

---

[2] DOJ's fallback reliance on the Second Colborn Declaration, D's Reply at 12 n. 5, is similarly unavailing. Mr. Colborn's statement as to why the information in Document 15 was provided to the Attorney General does not answer the question of whether the Attorney General in fact had authority to make the decision DOJ claims he was making.

The timeline in which Document No. 15 was prepared further disproves its predecisional, deliberative nature. Mr. Colborn now admits that Attorney General Barr saw previous versions of the memo, provided feedback, and sent his letter to Congress announcing what DOJ claims is the "decision" in question *before* the memo was finalized. *See* 2d Colborn Decl. ¶ 9. Mr. Colborn also acknowledges that in that period "[t]he substance of the advice contained in Document No. 15 did not change in any material way[.]" *Id.* In other words, Document No. 15 followed—not preceded—the Attorney General's so-called "decision, reflected the substance of what the Attorney General told Congress, and therefore can be neither predecisional nor deliberative.

To accept DOJ's arguments the Court also must ignore that far from a process to solicit legal advice and assistance on a matter within the purview of the Attorney General, DOJ, in fact, was engaged in a process of marshaling arguments to counter the damaging factual record Special Counsel Mueller had assembled and to mislead the public on the nature of the Special Counsel's findings. DOJ should not be allowed to cloak such misconduct in the protection of an independent prosecutorial decisional to escape public accountability for its actions. Exemption 5 is designed to protect legitimate governmental interests, not to act as a shield for misconduct or worse.

### 3. DOJ has not satisfied its evidentiary burden to show that the withheld documents are protected by the attorney client privilege.

DOJ also relies on the attorney client privilege as a basis to withhold Document Nos. 6 and 15, which it claims OLC prepared to provide legal advice to the Attorney General on whether the facts in Volume II of the Report "'would support initiating or declining the prosecution of the President for obstruction of justice under the Principles of Federal Prosecution.'" D's Reply at 18 (quoting Colborn Decl. ¶¶ 16, 17, 22). As to Document 6, DOJ is

14

flatly wrong; Document No. 6 was prepared more than six months before the Special Counsel submitted his report to the Attorney General and therefore could not possibly have provided legal advice on the sufficiency of the facts in that report.

Moreover, as to both documents DOJ still has not demonstrated that they were prepared to provide legal advice. Its only response—the patently insufficient Brinkmann Declaration and its claim that Plaintiff is misreading DOJ's regulations (D's Reply 15, 18)—are fully rebutted by the language of those regulations, the OLC opinion, and the Special Counsel's stated conclusions, as discussed above.

DOJ also falls far short of proving, as it must, that the two documents were not shared with third parties to the attorney client relationship. *See, e.g.*, *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252-53 (D.C. Cir. 1977) (for attorney client privilege to apply agency needed to demonstrate that the information was given "with the expectation of secrecy and was not known by or disclosed to any third party"). In this regard, the language of Mr. Colborn's latest declaration is most revealing. As to both Document Nos. 6 and 15, he attests only that to his knowledge, no part of either "has been shared outside of the Department of Justice." 2d Colborn Decl. ¶¶ 7, 10. His conclusory statement, however, is patently inadequate. Not only does Mr. Colborn fail to provide the basis for his knowledge, but also he provides no facts that would enable this Court to conclude that the purported confidentiality of the two documents was properly protected and maintained within the confines of the attorney-client relationship. Quite obviously the entire Department of Justice does not share an attorney-client relationship and the fact that the documents may not have been shared outside of the agency does not establish that their confidentiality was properly preserved and maintained by those within the scope of the attorney-client relationship.

### 4. DOJ has not demonstrated it would suffer foreseeable harm from disclosure of the withheld documents.

While DOJ pays lip service to the typical harms agencies allege would result if either deliberative or attorney-client protected information were disclosed, *see* D's Reply at 15-16, it ignores the context in which the documents at issue were prepared: an effort by the Attorney General to undermine the Special Counsel's findings by affirmatively misrepresenting them to Congress and the public. At times like this, where the Attorney General on behalf of the President is working at cross-purposes with the interests of the public and justice, the Court should not allow the FOIA to shield the Attorney General's actions from view.[3]

In these circumstances the withholding of documents creates a foreseeable harm that demands accountability through transparency. All of the evidence points to the fact that Attorney General Barr was engaged in arguable misconduct to protect President Trump by mischaracterizing the Special Counsel's evidence—an effort to which the Special Counsel himself took exception. In his March 27, 2019 letter to Attorney General Barr the Special Counsel stated that the representations the Attorney General made in his March 24 letter to Congress "did not fully capture the context, nature, and substance" of his office's "work and conclusions" and caused "public confusion about critical aspects of the results of [his] investigation" that "threaten[ed] to undermine a central purpose for which" DOJ had appointed

---

[3] A nearly 300-page report recently released by the University of Pennsylvania's Center for Ethics and the Rule of Law, Report on the Department of Justice and the Rule of Law (Oct. 12, 2020) ("CERL Report"), https://www.law.upenn.edu/live/files/10900-report-on-the-doj-and-the-rule-of-law, concluded that Attorney General Barr had "seriously and intentionally mischaracterized the Mueller Report when he presented its findings to Congress and to the American people." CERL Report at 9. According to the report, "[t]he purpose of this mischaracterization was indisputably political, namely to benefit Donald Trump by obscuring the Mueller Report's findings regarding the Russia probe." *Id.*

him: "to assure full public confidence in the outcome of the investigation."[4] *Id.* Transparency, not secrecy, is critical to restore that public confidence.

### 5. *In camera* review is well within this Court's authority to conduct and offers the best way to resolve any remaining questions.

In its cross-motion, Plaintiff explained that if the Court has remaining questions on the propriety of DOJ's withholdings, the small number of documents at issue makes *in camera* review a preferred option. *See Quinon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996).[5] Curiously DOJ resists this approach, arguing "*in camera* review is not the proper remedy," and that instead DOJ should be permitted to submit supplemental declarations. D's Reply at 21. The circumstances here make *in camera* review the optimal way for this Court to resolve any remaining questions.

First, contrary to DOJ's arguments, courts have recognized that *in camera* review presents considerable advantages where the documents at issue "are few in number and of short length." *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987). In those circumstances, *in camera* review may save time and money. *Id.* The documents at issue here are "few in number and of short length," strengthening the case for *in camera* review.

Second, with its opposition and reply DOJ submitted a supplemental declaration from Mr. Colborn. Having already had the proverbial second bite of the apple, DOJ should not be permitted to delay this matter further with the submission of yet another explanation of why its reasons for withholding do not fall short.

---

[4] That letter can be found at https://apps.npr.org/documents/document.html?id=5984399-Mueller-Letter-to-Barr.
[5] Plaintiff continues to assert, however, that on the basis of the current record the Court properly can order DOJ to disclose the withheld material.

In these circumstances, should the Court conclude it cannot resolve the issues without more information, it should exercise its "broad discretion in this area," *Quinon*, 86 F.3d at 1228, and order DOJ to provide the documents to the Court for *in camera* review.

**6.   If this Court believes dismissal of Count II is warranted it should make clear the reasoning of its earlier opinion denying DOJ's motion to dismiss remains good law and accurately states the record here.**

As this Court recognized in *Adams v. Judicial Council of Sixth Cir.*, No. CV 17-1894 (ABJ), 2020 WL 5409142, at *6 (D.D.C. Sept. 9, 2020), a defendant cannot "automatically moot a case simply by ending its unlawful conduct once sued." (citations omitted). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Id.* That caution is particularly apt here, where DOJ ended its unlawful conduct not of its own volition, but in response to this Court's finding that here DOJ's denial of expedition "was not the product of reasoned decision making," and that Plaintiff was not required to exhaust administrative remedies before filing suit challenging DOJ's expedition denial. *CREW v. U.S. Dep't of Justice*, 436 F. Supp. 3d at 359. DOJ has yet to offer any "reasoned decision making" but, as often happens with expedition in the FOIA context, events have overtaken this issue, specifically DOJ's eventual processing of CREW's request. Therefore, there is no additional relief this Court can award.

Nevertheless, even if dismissal of Count II is now warranted, the Court should make clear that the reasoning of its earlier opinion denying DOJ's motion to dismiss accurately states the law on exhaustion and that DOJ still has not offered a "reasoned decision" to justify denying CREW expedition. This clarity will help guard against a future denial of expedition by DOJ on

similar grounds and its insistence in litigation that a party challenging the denial of expedition must first exhaust administrative remedies.

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiff's cross-motion for summary judgment, the Court should deny Defendant's motion for summary judgment and grant Plaintiff's cross-motion.

Dated: October 20, 2020　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　 */s/ Anne L. Weismann*
　　　　　　　　　　　　　　　　　　　　Anne L. Weismann
　　　　　　　　　　　　　　　　　　　　(D.C. Bar No. 298190)
　　　　　　　　　　　　　　　　　　　　6117 Durbin Road
　　　　　　　　　　　　　　　　　　　　Bethesda, MD  20817
　　　　　　　　　　　　　　　　　　　　Phone: 301-717-6610
　　　　　　　　　　　　　　　　　　　　Weismann.anne@gmail.com

　　　　　　　　　　　　　　　　　　　　Adam J. Rappaport
　　　　　　　　　　　　　　　　　　　　(D.C. Bar No. 479866)
　　　　　　　　　　　　　　　　　　　　Citizens for Responsibility and Ethics
　　　　　　　　　　　　　　　　　　　　in Washington
　　　　　　　　　　　　　　　　　　　　1101 K Street, N.W., Suite 201
　　　　　　　　　　　　　　　　　　　　Washington, D.C.  20001
　　　　　　　　　　　　　　　　　　　　Phone: (202) 408-5565
　　　　　　　　　　　　　　　　　　　　arappaport@citizensforethics.org

　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*