**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 19-1552 (ABJ) |
| v. | ) ) | ***SEALED*** |
| U.S. DEPARTMENT OF JUSTICE, | ) ) | |
| Defendant. | ) ) | |

<u>**MEMORANDUM OPINION**</u>

On Friday, March 22, 2019, Special Counsel Robert S. Mueller, III delivered his Report of

the Investigation into Russian Interference in the 2016 Presidential Election[1] to the then-Attorney

General of the United States, William P. Barr.[2]

But the Attorney General did not share it with anyone else.

Instead, before the weekend was over, he sent a letter to congressional leaders purporting

to "summarize the principal conclusions" set out in the Report, compressing the approximately

200 highly detailed and painstakingly footnoted pages of Volume I – which discusses the Russian

government's interference in the election and any links or coordination with the Trump campaign

– and the almost 200 equally detailed pages of Volume II – which concerns acts taken by then-

---

1    Report of the Investigation into Russian Interference in the 2016 Presidential Election ("Mueller Report" or "Report"), Volume I, https://www.justice.gov/storage/report_volume1.pdf, Volume II, https://www.justice.gov/storage/report_volume2.pdf (March 2019).

2    *See* Letter from William P. Barr, Attorney General, to Hon. Lindsey Graham, Chairman, Committee on the Judiciary, United States Senate, et al. (Mar. 22, 2019), https://www.justice.gov/archives/ag/page/file/1147986/download.

President Trump in connection with the investigation – into less than four pages.[3]   The letter asserted that the Special Counsel "did not draw a conclusion – one way or the other – as to whether the examined conduct constituted obstruction," and it went on to announce the Attorney General's own opinion that "the evidence developed during the Special Counsel's investigation is not sufficient to establish that the President committed an obstruction-of-justice offense."[4]

The President then declared himself to have been fully exonerated.[5]

The Attorney General's characterization of what he'd hardly had time to skim, much less, study closely, prompted an immediate reaction, as politicians and pundits took to their microphones and Twitter feeds to decry what they feared was an attempt to hide the ball.

---

[3]     Letter from William P. Barr, Attorney General, to Hon. Lindsey Graham, Chairman, Committee on the Judiciary, United States Senate, *et al.* (Mar. 24, 2019), https://www.justice.gov/ag/page/file/1147981/download ("March 24 Letter") at 2; *see also id.* at 3 ("The Special Counsel's decision to describe the facts of his obstruction investigation without reaching any legal conclusions leaves it to the Attorney General to determine whether the conduct described in the report constitutes a crime.").

[4]     March 24 Letter at 3.

[5]     *Trump responds to Mueller report: 'complete and total exoneration*,' Reuters Staff, https://www.reuters.com/article/us-usa-trump-russia-tweet/trump-responds-to-mueller-report-complete-and-total-exoneration-idUSKCN1R50U3 (Mar. 24, 2019, 4:57 pm) (quoting the President's tweet:  "No Collusion, No Obstruction, Complete and Total EXONERATION. KEEP AMERICA GREAT!").  This tweet is currently unavailable due to President Trump's permanent suspension from Twitter on January 8, 2021, *see Permanent Suspension of @realDonaldTrump*, Twitter, Inc., https://blog.twitter.com/en_us/topics/company/2020/suspension.html (last visited Apr. 28, 2021), and the National Archives and Records Administration is still working to make the archival tweets available to the public.  *See Archived Social Media – Donald J. Trump Presidential Library*, National Archives, https://www.trumplibrary.gov/research/archived-social-media (last updated Apr. 26, 2021).

Even the customarily taciturn Special Counsel was moved to pen an extraordinary public rebuke on March 27:

> The summary letter the Department sent to Congress and released to the public late in the afternoon of March 24 did not fully capture the context, nature, and substance of this Office's work and conclusions. We communicated that concern to the Department on the morning of March 25. There is now public confusion about critical aspects of the results of our investigation. This threatens to undermine a central purpose for which the Department appointed the Special Counsel: to assure full public confidence in the outcome of the investigations.[6]

Mueller called for the immediate release of his report, *id.*, but it remained under wraps for another three weeks.

On April 18, 2019, the Attorney General appeared before Congress to deliver the report.[7] He asserted that he and the Deputy Attorney General reached the conclusion he had announced in the March 24 letter "in consultation with the Office of Legal Counsel and other Department lawyers." *Id.*

Citizens for Responsibility and Ethics in Washington ("CREW") immediately fired off a Freedom of Information Act ("FOIA") request for any records related to those consultations, but the Department of Justice ("DOJ") demurred on the grounds of the deliberative process and attorney-client privileges. What remains at issue today is a memorandum to the Attorney General dated March 24, 2019, that specifically addresses the subject matter of the letter transmitted to Congress.

---

6    Letter from Robert S. Mueller, III, Special Counsel, to Hon. William P. Barr, Attorney General of the United States (Mar. 27, 2019), available at https://apps.npr.org/documents/document.html?id=5984399-Mueller-Letter-to-Barr ("March 27 Letter").

7    Attorney General William P. Barr Delivers Remarks on the Release of the Report on the Investigation into Russian Interference in the 2016 Presidential Election, DOJ Justice News (Apr. 18, 2019), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-release-report-investigation-russian ("April 18 Remarks").

It is time for the public to see that, too.

CREW brought this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, against the United States Department of Justice ("DOJ"), seeking the production of documents that Attorney General Barr reviewed in advance of his public announcement concerning the report transmitted to him by Special Counsel Mueller.  Compl. [Dkt. # 1] ¶¶ 1–2. The complaint contained two counts:  the first alleged wrongful withholding of non-exempt records, and the second requested a declaration from the Court, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that DOJ violated FOIA by refusing to grant expedited processing of its request.  *Id.* ¶¶ 1, 23–24.[8]

CREW has accepted the bulk of the agency's withholdings, but there are still two records in dispute, and cross motions for summary judgment and defendant's renewed motion to dismiss Count Two are pending before the Court.  Def.'s Mot. for Summ. J. and Mot. to Dismiss for Lack of Jurisdiction [Dkt. # 15] ("Def.'s Mot."); Pl.'s Mem. in Opp. to Mot. for Summ. J. and Renewed Mot. to Dismiss [Dkt. # 16]; Pl.'s Cross Mot. for Summ. J. [Dkt. # 17] ("Pl.'s Cross Mot.").  With respect to Count One, the motions address whether it was proper for defendant to withhold the two records under FOIA Exemption 5.  The Court finds that the record designated as Document 6 was properly withheld, but it will order that Document 15 be produced.  As to Count Two, the parties dispute whether the claim about expedited processing is now moot, and the Court agrees with the defendant and will dismiss that count.

---

8       On January 31, 2020, the Court denied defendant's partial motion to dismiss Count Two. *See* Order [Dkt. # 9].

## FACTUAL AND PROCEDURAL HISTORY

CREW states that it is a "non-profit, non-partisan organization . . . committed to protecting the rights of citizens to be informed about the activities of government officials and agencies." Compl. ¶ 4.  The complaint alleges that on April 18, 2019, Attorney General Barr held a press conference to announce the public release of the Report of the Special Counsel's investigation into Russian interference in the 2016 election and the potential obstruction of that investigation.  *Id.* ¶ 13.  During that conference, Attorney General Barr "stated 'that the evidence developed by the Special Counsel is not sufficient to establish that the President committed an obstruction-of-justice offense.'"  *Id.*, quoting April 18 Remarks, *supra* footnote 7.

Later that day, CREW submitted a FOIA request to DOJ's Office of Legal Counsel ("OLC"), seeking "all documents pertaining to the views OLC provided Attorney General Barr on whether the evidence developed by Special Counsel Mueller is sufficient to establish that the President committed an obstruction-of-justice offense."  Compl. ¶ 14.

The defendant conducted the necessary search, and it identified sixty-one responsive records, thirty-two of which it produced to plaintiff with partial redactions, and twenty-eight of which it withheld in full pursuant to Exemption 5.  Def.'s Mem. in Supp. of Mot. [Dkt. # 15-2] ("Def.'s Mem.") at 4–5.  It referred one record to the Office of Information Policy ("OIP"), which was later produced to plaintiff with redactions.  *Id.* at 5.  Two of the documents withheld in full remain in dispute, and they are the subject of the parties' cross motions for summary judgment.  *See* Def.'s Mot; Pl.'s Mot.  Defendant's motion is supported by the declaration of a Special Counsel within OLC who supervises that office's responses to the FOIA requests, *see* Decl. of Paul P. Colborn [Dkt. # 15-3] ("Colborn Decl.") ¶ 1, and the declaration of a Senior Counsel in

the OIP, who has supervisory authority over the handling of FOIA requests that are subject to litigation. *See* Decl. of Vanessa R. Brinkmann [Dkt. # 15-4] ("Brinkmann Decl.") ¶ 1.

## LEGAL BACKGROUND

### I.    The Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324.

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

When the court is presented with cross-motions for summary judgment, it analyzes the underlying facts and inferences in each party's motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 247.

## II.     The Freedom of Information Act

The Freedom of Information Act ("FOIA") compels government agencies to release records upon request.  5 U.S.C. § 552.  The act also authorizes agencies to withhold the requested records if they can demonstrate that the record falls into one of nine specific exemptions.  *See id.* § 552(b); *Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010).

Consistent with FOIA's presumption in favor of disclosure, the exemptions are to be construed narrowly, and the withholding agency bears the burden of showing that the claimed exemption applies.  *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976); *Loving v. Dep't of Defense*, 550 F.3d 32, 37 (D.C. Cir. 2008).  "[W]hen an agency seeks to withhold information, it must provide 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant[.]'" *Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007), quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987); *see also Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 30 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999) ("To justify summary judgment, a declaration must provide detailed and specific information demonstrating that material withheld is logically within the domain of the exemption claimed.") (internal quotation omitted).

When summary judgment turns upon the applicability of an exemption, the court must "ascertain whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempted from disclosure."  *Assassination Archives & Rsch. Cent. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003).  Moreover, pursuant to a 2016 amendment to the FOIA statute, an agency may withhold information pursuant to an exemption only if it "reasonably foresees that disclosure would harm an interest protected by" that exemption.  5 U.S.C. § 552(a)(8)(A).  This "reasonable foreseeability of harm" standard requires the withholding agency to provide "context or insight into the specific decision-making processes or deliberations at issue, and how they

in particular would be harmed by disclosure" of the contested records.  *Judicial Watch, Inc. v. U.S. Dep't of Justice*, No. 17-0832 (CKK), 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019).

In a FOIA case, a court may grant summary judgment based on information provided in an agency's affidavits or declarations when they are "relatively detailed and non-conclusory[.]" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted).  Federal Rule of Civil Procedure 56(c) states that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c).

The law recognizes that there are circumstances when an agency declaration may properly include hearsay.  The D.C. Circuit long ago recognized the validity of the affidavit of an individual who supervised a search for records even though the affiant has not conducted the search himself as sufficient for a declarant in a FOIA action.  *See Meeropol v. Meese*, 790 F.2d 942, 951 (D.C. Cir. 1986); *see also Barnard v. Dep't of Homeland Sec.*, 531 F. Supp. 2d 131, 135 (D.D.C. 2008) ("Consistent with these requirements, hearsay in FOIA [search] declarations is often permissible."); *Humane Soc'y of U.S. v. Animal & Plant Health Inspection Serv.*, 386 F. Supp. 3d 34, 44 (D.D.C. 2019) (acknowledging that hearsay is permissible in justifying the adequacy of the search.).

But courts have not always found hearsay to be sufficient when it is offered to justify the withholding of records based on an exemption.  *See Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981) (district court's grant of summary judgement reversed due to the affiant's lack of personal knowledge of the facts underlying the exemption and his reliance on hearsay); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 224 F.R.D. 261, 264–65 (D.D.C. 2004) (court struck portions of the agency FOIA Director's declaration due to a lack of personal knowledge

and impermissible hearsay).  As the court observed in *Humane Society*, "[u]ltimately, it is the Court, not the agency, that must be satisfied with the propriety of a claimed FOIA exemption." 386 F. Supp. 3d at 44.

Above all, though, it is essential that agency affidavits be accurate.  "[S]ummary judgment may be granted on the basis of agency affidavits" in FOIA cases, when those affidavits "contain reasonable specificity of detail rather than merely conclusory statements," and when "they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013), quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006).  As the D.C. Circuit has emphasized, this Court should be able to depend on the accuracy of submissions that are intended "to permit adequate adversary testing of the agency's claimed right to an exemption." *Nat'l Treasury Emps. Union v. U.S. Customs Serv.*, 802 F.2d 525, 527 (D.C. Cir. 1986) (citations omitted); *see Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992), *abrogated by Milner v. Dep't of Navy*, 562 U.S. 562 (2011) ("FOIA litigation is not immune from our open, adversary process . . . .  We expect agencies to ensure that their submissions in FOIA cases are absolutely accurate."); *see also Cause of Action Inst. v. Export-Import Bank of the U.S.*, No. 19-cv-1915 (JEB), 2021 WL 706612, at *14 (D.D.C. Feb. 23, 2021) (ordering disclosure of records when "[e]ven the briefest *in camera* review reveals that [defendant's] description is plainly overbroad and . . . seemingly inaccurate, as their content has nothing to do with" the claimed exemption).

Finally, when considering a motion for summary judgment under FOIA, the court must conduct a *de novo* review of the record.  *See* 5 U.S.C. § 552(a)(4)(B).

III.     FOIA Exemption 5

Defendant withheld the two records in dispute in this case pursuant to FOIA Exemption 5, which bars disclosure of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."   5 U.S.C. § 552(b)(5).

A document may be properly withheld under Exemption 5 if it satisfies "two conditions: its source must be a [g]overnment agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see also Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1121 (D.C. Cir. 1989), quoting *Taxation Without Representation v. IRS*, 646 F.2d 666, 676 (D.C. Cir. 1981) (Exemption 5 encompasses "the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context, including . . . the executive deliberative process privilege.").

Here, the agency invoked the deliberative process privilege and the attorney-client privilege, both of which fall under the ambit of Exemption 5.  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862–63 (D.C. Cir. 1980); *Elec. Frontier Found. v. U.S. Dep't of Just.*, 739 F.3d 1, 4 (D.C. Cir. 2014).

### A.  Deliberative process privilege

The deliberative process privilege "allows the government to withhold documents and other materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *In re Sealed Case ("Espy")*, 121 F.3d 729, 736–37 (D.C. Cir. 1997) (internal quotations omitted).  The

Supreme Court has explained that it "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery," and its purpose "is to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the Government." *Klamath*, 532 U.S. at 8–9, quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975).

To accomplish that goal, "[t]he deliberative process privilege protects agency documents that are both predecisional and deliberative." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006), citing *Coastal States*, 617 F.2d at 866.

> Both requirements stem from the privilege's "ultimate purpose[, which] . . . is to prevent injury to the quality of agency decisions" by allowing government officials freedom to debate alternative approaches in private. The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made or protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations.

*Espy*, 121 F.3d at 737 (citations omitted).

A document is predecisional if "'it was generated before the adoption of an agency policy' and deliberative if 'it reflects the give-and-take of the consultative process.'" *Judicial Watch, Inc.*, 449 F.3d at 151, quoting *Coastal States*, 617 F.2d at 866.  In other words, a "'predecisional' document is one 'prepared in order to assist an agency decisionmaker in arriving at his decision.'" *Formaldehyde Inst.*, 889 F.2d at 1122, quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975).

When analyzing whether materials are covered by the privilege, a "court must first be able to pinpoint an agency decision or policy to which these documents contributed." *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983).  "The agency bears the burden of establishing the character of the decision, the deliberative process involved, and the role played by the documents in the

11

course of that process." *Id.*; *see also Coastal States*, 617 F.2d at 868 (The burden is on the agency to establish "what deliberative process is involved, and the role played by the documents in issue in the course of that process."). If the documents in question "are not a part of a clear 'process' leading to a final decision on the issue . . . they are less likely to be properly characterized as predecisional." *Coastal States*, 617 F.2d at 868, citing *Vaughn v. Rosen*, 523 F.2d 1136, 1146 (D.C. Cir. 1975).[9]

With respect to the "deliberative" prong of the test, the exemption "protects not only communications which are themselves deliberative in nature, but all communications which, if revealed, would expose to public view the deliberative process of an agency." *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982), citing *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63 (D.C. Cir. 1974).

### B.  The attorney-client privilege

It is also well-settled that Exemption 5 embraces the attorney-client privilege. *See Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977) (The D.C. Circuit has "agree[d] that attorney-client privilege has a proper role to play in exemption five cases."); *see also Coastal States*, 617 F.2d at 862 ("The courts have recognized that Exemption 5 protects, as a general rule, material which would be protected under the attorney-client privilege . . . .").

---

9       As the Supreme Court has recognized, "[a]gencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions . . . ." *Sears*, 421 U.S. at 151 n.18. For that reason, it is not necessary that an internal discussion lead to the adoption of a specific government policy or a discrete decision; "its protection under Exemption 5 is not foreclosed as long as the document was generated as part of a definable decision-making process." *Gold Anti-Tr. Action Comm., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 762 F. Supp. 2d 123, 136 (D.D.C. 2011).

"The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997), citing *In re Sealed Case,* 737 F.2d 94, 98–99 (D.C. Cir. 1984). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981). The privilege also protects communications that flow from attorneys to their clients, but only if the communications are based, at least in part, on confidential information obtained from the client. *In re Sealed Case*, 737 F.2d at 98–99; *see also Mead Data Cent.,* 566 F.2d at 254. The D.C. Circuit has emphasized that it is the claimant's burden "to present to the court sufficient facts to establish the privilege; the claimant must demonstrate with reasonable certainty . . . that the lawyer's communication rested in significant and inseparable part on the client's confidential disclosure." *In re Sealed Case*, 737 F.2d at 99 (internal quotations omitted).

These principles are not limited to lawyers representing private individuals or entities, but they apply to those who work in the public sector as well. In the governmental context, the "client" may be a government official or agency, "and the attorney may be an agency lawyer." *Tax Analysts*, 117 F.3d at 618. And those attorneys may communicate among themselves; "the [attorney-client] privilege is not lost because an attorney consults other attorneys about the subject matter of the communication." Mead Data Cent., 566 F.2d at 253, n.24.

But the mere fact that the communication involves a member of the bar does not end the inquiry. *See Mead Data Cent.*, 566 F.2d at 253 ("The privilege does not allow the withholding of documents simply because they are the product of an attorney-client relationship . . . ."). For instance, the privilege does not extend to a "government attorney's 'advice on political,

strategic, or policy issues, valuable as it may [be].'" *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.,* 926 F. Supp. 2d 121, 144–45 (D.D.C. 2013), quoting *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998). And, where an agency lawyer serves in a mixed capacity that includes responsibilities that fall both within and "outside the lawyer's sphere," that lawyer's advice will be protected only to the extent that the lawyer offered it in their professional, legal capacity. In re Sealed Case, 737 F.2d at 99. As another court in this district explained, to invoke the privilege, the Department of Justice must establish that securing legal advice was a "primary purpose" of the communication in question. *Cause of Action Inst. v. United States Dep't of Just.*, 330 F. Supp. 3d 336, 347 (D.D.C. 2018); *see also id.*, quoting *Campbell,* 164 F.3d at 30 ("[T]he burden rests with the Government to prove, through 'detailed and specific information,' that the withheld information falls within the domain of the privilege."). Finally, "[l]ike all privileges . . . the attorney-client privilege is narrowly construed and is limited to those situations in which its purposes will be served. *Coastal States*, 617 F.2d at 862.

## ANALYSIS

With that legal backdrop in mind, the Court reviewed the declarations submitted by the government in this case, the pleadings, and the two documents themselves *in camera*. Since its decision rests in part on the content of one of the documents, the portions of the opinion that refer directly to withheld material will be sealed pending further order of the Court, and a redacted version will be made available on the public docket.

**I.      Document 6 was properly withheld.**

According to the Colborn declaration, "[t]he principal function of the OLC is to assist and advise the Attorney General in his role as legal advisor to the President of the United States and to departments and agencies of the Executive Branch." Colborn Decl. ¶ 2. OLC does not make

policy decisions; it "provides advice and prepares opinions addressing a wide range of legal questions," *id.*, and "OLC legal advice in all its forms is generally kept confidential." *Id.* ¶ 3.

Colborn describes Document 6 as an "untitled, undated draft legal analysis," prepared by Steven A. Engel, an Assistant Attorney General within the Office of Legal Counsel, "for his use in providing legal advice within the Department of Justice." Colborn Decl. ¶ 16. Colborn adds that "[t]he document contains OLC legal advice and analysis, and also contains confidential client information and descriptions of Department of Justice deliberations." *Id.* He avers that the record is covered by the deliberative process privilege "because it was legal analysis submitted to the Attorney General as part of his decisionmaking." *Id.* ¶ 20.

While these vague references to "decisionmaking" and "deliberations" did little to establish the first element of the deliberative process privilege, the *in camera* review of the record revealed that there was a particular, immediate decision under review to which the document pertained, that it also addressed another specific issue that was likely to arise as a consequence of the determination made with respect to the first, and that the entire memorandum was deliberative with respect to those decisions. The Court therefore finds that it was properly withheld under Exemption 5 and the deliberative process privilege.[10]

## II.   Document 15 must be released.

The unredacted portion of Document 15 that was disclosed to the plaintiff reveals this much about its nature and contents:

---

10     For that reason, the Court need not reach the question of whether the memorandum, which did consist of legal analysis by an attorney at the Office of Legal Counsel, may be withheld under the attorney-client privilege.



**U.S. Department of Justice**

*Washington D.C. 20530*

March 24, 2019

MEMORANDUM FOR THE ATTORNEY GENERAL

THROUGH:      THE DEPUTY ATTORNEY GENERAL

FROM:           Steven A. Engel
                     Assistant Attorney General, Office of Legal Counsel

                     Edward C. O'Callaghan
                     Principal Associate Deputy Attorney General

SUBJECT:      Review of the Special Counsel's Report

    At your request, we have evaluated Volume II of the Special Counsel's Report on the Investigation into Russian Interference in the 2016 Presidential Election to determine whether the facts recited therein would support initiating or declining the prosecution of the President for obstruction of justice under the Principles of Federal Prosecution, **(b) (5)**

    For the reasons stated below, we conclude that the evidence described in Volume II of the Report is not, in our judgment, sufficient to support a conclusion beyond a reasonable doubt that the President violated the obstruction-of-justice statutes.[1] **(b) (5)** Accordingly, **(b) (5)** we would recommend, under the Principles of Federal Prosecution, that you decline to commence such a prosecution. **(b) (5)**

---

[1]  Given the length and detail of the Special Counsel's Report, we do not recount the relevant facts here. Our discussion and analysis assumes familiarity with the Report as well as much of the background surrounding the Special Counsel's investigation.

### A. Defendant has not met its burden to justify withholding under the deliberative process privilege.

    The memorandum is largely deliberative. But the Court cannot find the record to be "predecisional," because the materials in the record, including the memorandum itself, contradict the FOIA declarants' assertions that the decision-making process they have identified was in fact underway. Moreover, the record supplies reason to question whether the communication preceded any decision that was made.

Paul Colborn, the Special Counsel in the OLC, states:

> I am personally familiar with the withheld documents at issue in this case.
>
> * * *
>
> Document no. 15 is a predecisional deliberative memorandum to the Attorney General, through the Deputy Attorney General, authored by OLC AAG Engel and Principal Associate Deputy Attorney General ("PADAG") Edward O'Callaghan . . . .  As indicated in the portions of the memorandum that were released, **it was submitted to the Attorney General to assist him in determining whether the facts set forth in Volume II of Special Counsel Mueller's report "would support initiating or declining the prosecution of the President for obstruction of justice under the Principles of Federal Prosecution.**"  The released portions also indicate that the memorandum contains the authors' recommendation in favor of a conclusion that "the evidence developed by the Special Counsel's investigation is not sufficient to establish that the President committed an obstruction-of-justice offense."  The withheld portions of the memorandum contain legal advice and prosecutorial deliberations in support of that recommendation.  **Following receipt of the memorandum, the Attorney General announced his decision** publicly in a letter to the House and Senate Judiciary Committees . . . .
>
> * * *
>
> [T]he withheld portions of document no. 15 – the only final document at issue – are . . . covered by the deliberative process privilege.  The document is a predecisional memorandum, submitted by senior officials of the Department to the Attorney General, and **containing advice and analysis supporting a recommendation regarding the decision he was considering** . . . .  [T]he withheld material is protected by the privilege because it consists of candid advice and analysis by the authors, OLC AAG Engel and the senior deputy to the Deputy Attorney General.  **That advice and analysis is predecisional because it was provided prior to the Attorney General's decision in the matter,** and it is deliberative because it consists of advice and analysis to assist the Attorney General in making that decision . . . .  The limited factual material contained in the withheld portion of the document is closely intertwined with that advice and analysis.

Colborn Decl. ¶¶ 13, 17, 21 (emphasis added).

The Brinkmann declaration reveals that as Senior Counsel in the DOJ Office of Information Policy, she is responsible for supervising the handling of the FOIA requests.

Brinkmann Decl. ¶ 1. She does not claim to have any personal knowledge of why the document was created or what its purpose might be, and while she states generally at the beginning of the declaration that she consulted with "knowledgeable Department personnel," she does not state that she spoke with any particular person to gain first hand information about the provenance of this document. *Id.* ¶ 3. Instead, she appears to rely on her review of the document itself to make the following unattributed pronouncements about the decision that is supposedly at issue:

> While the March 2019 Memorandum is a "final" document (as opposed to a "draft" document), the memorandum as a whole contains pre-decisional recommendations and advice solicited by the Attorney General and provided by OLC and PADAG O'Callaghan. The material that has been withheld within this memorandum consists of OLC's and the PADAG's candid analysis and legal advice to the Attorney General, which was provided to the Attorney General **prior to his final decision on the matter.** It is therefore pre-decisional. The same material is also deliberative, as **it was provided to aid in the Attorney General's decision-making process** as it relates to the findings of the SCO investigation, and **specifically as it relates to whether the evidence developed by SCO's investigation is sufficient to establish that the President committed an obstruction-of-justice offense. This legal question is one that the Special Counsel's "Report On The Investigation Into Russian Interference In The 2016 Presidential Election" . . . did not resolve. As such, any determination as to whether the President committed an obstruction-of-justice offense was left to the purview of the Attorney General.**

Brinkmann Decl. ¶ 11 (emphasis added).

CREW had difficulty swallowing this explanation.

> DOJ's . . . arguments rest on the demonstrably false proposition that the memo was submitted to the Attorney General to assist him in making a legitimate decision on whether to initiate or decline prosecution of the President for obstructing justice . . . . [H]owever, the Special Counsel already had made final prosecutorial judgments and the time for the Attorney General to challenge those judgments had passed. Whatever the contents of the March 24, 2019 OLC memo, it was not part of a deliberation about whether or not to prosecute the President.

Pl.'s Mem. in Supp. of Cross Mot. [Dkt. # 17-1] ("Pl.'s Mem.") at 15–16; *see also id.* at 15 ("The absence of a pending decision for the Attorney General to make necessarily means the memo did

not make a recommendation or express an opinion on a legitimate legal or policy matter.  Instead, it was part of a larger campaign initiated by Attorney General Barr to undermine the Special Counsel's report and rehabilitate the President . . . .").

What the Court can say without revealing the content of the redacted material is that there were two sections to this memorandum.  Section I offers strategic, as opposed to legal advice, about whether the Attorney General should take a particular course of action, and it made recommendations with respect to that determination, a subject that the agency omitted entirely from its description of the document or the justification for its withholding.  This is a problem because Section I is what places Section II and the only topic the agency does identify – that is, whether the evidence gathered by the Special Counsel would amount to obstruction of justice – into its proper context.  Moreover, the redacted portions of Section I reveal that both the authors and the recipient of the memorandum had a shared understanding concerning whether prosecuting the President was a matter to be considered at all.  In other words, the review of the document reveals that the Attorney General was *not* then engaged in making a decision about whether the President should be charged with obstruction of justice; the fact that he would not be prosecuted was a given.  The omission of any reference to Section I in the agency declarations, coupled with the agency's redaction of critical caveats from what it did disclose, served to obscure the true purpose of the memorandum.  Thus, the Court's *in camera* review leads to the conclusion that the agency has fallen far short of meeting its burden to show that the memorandum was "prepared in order to assist an agency decisionmaker in arriving at his decision."  *Formaldehyde Inst.*, 889 F.2d at 1122.

What follows is a discussion of the memorandum in its entirety.



11 ██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████ DOJ made a strategic decision to pretend as if the first portion of the memorandum was not there ████████████████████████████████████████████████████████████████

The Court is under no obligation to assess the applicability of a privilege on a ground the agency declined to assert; the D.C. Circuit has stated that while *in camera* review is permissible, it should be reserved for those cases when it truly necessary, and for that reason, "it 'is not a substitute' for the government's obligation to justify its withholding in publicly available and debatable documents." *Schiller*, 964 F.2d at 1209, quoting *Lykins v. U.S. Dep't of Just.*, 725 F.2d 1455, 1463 (D.C. Cir. 1984). "We expect agencies to ensure that their submissions in FOIA cases are absolutely accurate." *Id.*

21



All of this contradicts the declarant's *ipse dixit* that since the Special Counsel did not resolve the question of whether the evidence would support a prosecution, "[a]s such, any determination as to whether the President committed an obstruction-of-justice offense was left to the purview of the Attorney General."  Brinkmann Decl. ¶ 11.  It also calls into question the accuracy of Attorney General Barr's March 24 representation to Congress:  "The Special Counsel's decision to describe the facts of his obstruction investigation without reaching any legal conclusions leaves it to the Attorney General to determine whether the conduct described in the report constitutes a crime."  March 24 Letter at 3.[12]

---

12      It is true that the Special Counsel "determined not to make a traditional prosecutorial judgment."  Report, Volume II, at 1.  What the Attorney General neglected to say, though, was that while the Special Counsel accepted "for the purpose of exercising prosecutorial jurisdiction" the 2000 opinion of the Office of Legal Counsel that that the indictment or criminal prosecution of a sitting President would be unconstitutional, and apart from that, he also "recognized that a federal criminal accusation against a sitting President would place burdens on the President's capacity to govern and potentially preempt constitutional processes for addressing presidential misconduct," Report, Volume II, at 1, he did not leave the matter there.  Instead, the Special Counsel specifically informed the Attorney General:

> [I]f we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state. Based on the facts and the applicable legal standards, however, we are unable to reach that judgment.  The evidence we obtained about the President's actions and intent presents difficult issues that prevent us from conclusively determining that no criminal conduct occurred.  Accordingly, while this report does not conclude that the President committed a crime, it also does not exonerate him.

*Footnote continues on next page.*

And the *in camera* review of the document, which DOJ strongly resisted, *see* Def.'s Opp. to Pl.'s Cross Mot. [Dkt. # 19] ("Def.'s Opp.") at 20–22 ("*In Camera* Review is Unwarranted and Unnecessary"), raises serious questions about how the Department of Justice could make this series of representations to a court in support of its 2020 motion for summary judgment:

> [T]he March 2019 Memorandum (Document no. 15), which was released in part to Plaintiff is a pre-decisional, deliberative memorandum to the Attorney General from OLC AAG Engel and PADAG Edward O'Callaghan . . . . The document contains their candid analysis and advice provided to the Attorney General prior to his final decision on the issue addressed in the memorandum – whether the facts recited in Volume II of the Special Counsel's Report would support initiating or declining the prosecution of the President . . . . It was provided to aid in the Attorney General's decision-making processes as it relates to the findings of the Special Counsel's investigation . . . . Moreover, because any determination as to whether the President committed an obstruction-of-justice offense was left to the purview of the Attorney General, the memorandum is clearly pre-decisional.

Def.'s Mem. in Supp. of Mot. [Dkt. # 15-2] ("Def.'s Mem.") at 14–15 (internal quotations, brackets, and citations omitted).[13] ███████████████████████

---

*Id.* at 2; *see also id.*, Conclusion, at 182 ("[I]f we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state. Based on the facts and the applicable legal standards, we are unable to reach that judgment."); *see also id.*, Section III (B)(2), at 168–69 (finding that the separation of powers concerns that might pose a constitutional impediment to a criminal prosecution did not apply to Congress: "Congress can validly regulate the President's exercise of official duties to prohibit actions motivated by a corrupt intent to obstruct justice."). This cannot be easily squared with the assurances the Attorney General transmitted to Congress in March of 2019 instead of the report itself. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Just. ("EPIC")*, 442 F. Supp. 3d 37, 49 (D.D.C. 2020) ("[A] review of the redacted version of the Mueller Report by the Court results in the Court's concurrence with Special Counsel Mueller's assessment that Attorney General Barr distorted the findings in the Mueller Report.").

13      The flourish added in the government's pleading that did not come from either declaration – "PADAG O'Callaghan had been directly involved in supervising the Special Counsel's investigation and related prosecutorial decisions; as a result, in that capacity, his candid prosecutorial recommendations to the Attorney General were especially valuable." *Id.* at 14 – seems especially unhelpful since there was no prosecutorial decision on the table.



<sup>14</sup>

In sum, while CREW had never laid eyes on the document, its summary was considerably more accurate than the one supplied by the Department's declarants.

As noted above, summary judgment may be granted on the basis of agency affidavits in FOIA cases, when "they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Judicial Watch, Inc.*, 726 F.3d at 215, quoting *Consumer Fed'n*, 455 F.3d at 287.

But here, we have both.  Another court in this district has expressed "grave concerns about the objectivity of the process that preceded the public release of the redacted version of the Mueller Report."  *EPIC*, 442 F. Supp. 3d at 48.  The district court in the *EPIC* case undertook a close

---

[14]    This effort was not without consequences.  As the Special Counsel noted in his March 27 letter to the Attorney General, the "public confusion about critical aspects of the results of [his] investigation" that Attorney General Barr's March 24 letter had caused "threaten[ed] to undermine a central purpose for which" DOJ had appointed him:  "to assure full public confidence in the outcome of the investigation."  March 27 Letter at 1.

comparison of the Attorney General's March 24 pronouncements and the redacted version of the Special Counsel's Report that had by then been released, and the process left him uneasy.

> Although Attorney General Barr can be commended for his effort to expeditiously release a summary of Special Counsel Mueller's principal conclusions in the public interest, the Court is troubled by his hurried release of his March 24, 2019 letter well in advance of when the redacted version of the Mueller Report was ultimately made available to the public. The speed by which Attorney General Barr released to the public the summary of Special Counsel Mueller's principal conclusions, coupled with the fact that Attorney General Barr failed to provide a thorough representation of the findings set forth in the Mueller Report, causes the Court to question whether Attorney General Barr's intent was to create a one-sided narrative about the Mueller Report – a narrative that is clearly in some respects substantively at odds with the redacted version of the Mueller Report.

*Id.* at 49.

And of even greater importance to this decision, the affidavits are so inconsistent with evidence in the record, they are not worthy of credence. The review of the unredacted document *in camera* reveals that the suspicions voiced by the judge in *EPIC* and the plaintiff here were well-founded, and that not only was the Attorney General being disingenuous then, but DOJ has been disingenuous to this Court with respect to the existence of a decision-making process that should be shielded by the deliberative process privilege. The agency's redactions and incomplete explanations obfuscate the true purpose of the memorandum, and the excised portions belie the notion that it fell to the Attorney General to make a prosecution decision or that any such decision was on the table at any time. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

There is also a problem with the "<u>pre</u>" portion of "pre-decisional."

The D.C. Circuit's opinion in *Paisley,* which remanded a case in which judgment had been entered in favor of the government, teaches that a court should be able "to ascertain whether the

disputed documents played any role" in the decision the government identified.  712 F.2d at 698.

Here, the declarations state that Attorney General Barr made the determination he communicated

to Congress based on the advice contained in the memo.  *See* Brinkmann Decl. ¶ 11.  But even

with their significant redactions, the contemporaneous emails that were produced to CREW by the

government in response to its FOIA request tell a different story, and this assertion in the

declarations is inconsistent with the actual chronology.

In its summary judgment pleading, CREW directs the Court's attention to its Exhibit A,

which contains the series of emails produced by the defendant in response to the FOIA request that

relate to the creation of the March 24 letter to Congress and the March 24 memorandum to Barr.

While any drafts or proposed additions or revisions that were transmitted have been completely

redacted from the emails, one can discern from the skeletal remains when the emails were written,

who sent them to whom, and to which draft document they refer.  *See* Ex. A to Pl.'s Opp. to Def's

Mot. [Dkt. # 16-1].[15]

CREW points out that the letter to Congressional leaders and the memorandum to the

Attorney General were being drafted simultaneously, and based on the email traffic, it argues:

> Far from providing the Attorney General with a formal legal opinion based
> on its own analysis, OLC drafted the memorandum with significant input
> from the Deputy Attorney General and others in his office.  *See* Exhibit A,
> pp. 10–20, 35–37.  OLC also played an active role in editing the letter the
> Attorney General was preparing for Congress.  *Id.* at 21–34.  The two
> offices were working in tandem to create a narrative to counter the Special
> Counsel's findings and cast the President in the most positive light possible.

Pl.'s Mem. at 15.

---

15      The same exhibit was filed in support of Plaintiff's Cross-Motion for Summary Judgment.
[Dkt. # 17-2].

The Court has created a chart listing all of the emails in chronological order.  It is attached to this opinion as Attachment 1 and incorporated in the opinion as part of the Court's factual findings.  The emails are exchanged among Stephen A. Engel, an Assistant Attorney General in the Office of Legal Counsel; Brian C. Rabbitt, the Chief of Staff in the Office of the Attorney General; Rod Rosenstein, the Deputy Attorney General; and Edward C. O'Callaghan, the Principal Associate Deputy Attorney General, and at least one is copied to another person in OLC: Henry C. Whitaker (OLC).

A close review of the communications reveals that the March 24 letter to Congress describing the Special Counsel's report, which assesses the strength of an obstruction-of-justice case, and the "predecisional" March 24 memorandum advising the Attorney General that ███████ ████████████████████████████████ the evidence does not support a prosecution, are being written by the very same people at the very same time.  The emails show not only that the authors and the recipients of the memorandum are working hand in hand to craft the advice that is supposedly being delivered by OLC, but that the letter to Congress is the priority, and it is getting completed first.  At 2:16 pm on Sunday, March 24, the Attorney General's Chief of Staff advises the others:  "We need to go final at 2:25 pm," and Rod Rosenstein, the Deputy Attorney General, summons everyone to a meeting at 2:17 pm.  Attachment 1 at 4.  At 2:18 pm, Steven Engel in the OLC replies to this email chain related to the draft letter, and he attaches the latest version of the memo to the Attorney General, saying:  "here's the latest memo, btw, although we presumably don't need to finalize that as soon."  *Id.*; *see also id.* at 6 (finalizing the letter just before 5:00 pm on March 24 and the memorandum just before 9:00 am on March 25).  In sum, the set of emails contained in plaintiff's Exhibit A undermines the uninformed assertions in the declarations upon which the defense relies.

For all of these reasons, the Court finds that the document is not predecisional, and it may not be withheld under Exemption 5 on the basis of the deliberative process privilege.[16]  This finding requires the Court to go on to the other basis for withholding proffered by the declarants: the attorney-client privilege.

### B.  The defendant has not met its burden to establish the applicability of the attorney-client privilege.

The DOJ declarant ties the attorney-client privilege directly to the decision she claimed was being made in the context of the deliberative process privilege:

> All of the information contained within the March 2019 Memorandum, but withheld from release to Plaintiff is also withheld pursuant to the attorney-client privilege of Exemption 5.   The role of OLC attorneys includes providing "opinions to the Attorney General . . . on questions of law arising in the administration of the Department."  25 C.F.R. § 0.25(c).  In this capacity, OLC attorneys and the Attorney General maintain an attorney-client relationship.   As described *supra* ¶ 7, the March 2019 Memorandum contains OLC's and the PADAG's legal analysis and advice solicited by the Attorney General and shared in the course of providing confidential legal advice to the Attorney General.   As such, OIP has determined that the attorney-client privilege, in addition to the deliberative process privilege, applies to the withheld portions of the March 2019 Memorandum.

---

16     In light of this finding, the Court need not assess the sufficiency of agency's showing concerning the reasonably foreseeable harm that could flow from the production of the record under 5 U.S.C. § 552(a)(8)(A).  It notes, though, that the Colborn declaration did little to comply with that provision.  He stated that disclosure "would compromise the deliberative processes of the Executive Branch – in this case, of the Attorney General and his senior advisers deliberating over an extremely high-profile prosecutorial matter and the related public statements to be made about that matter," Colborn Decl. ¶ 23, but this merely recites the elements of the privilege.  This sentence was the only time either declarant even hinted that the document had something to do with the Attorney General's "public statements," but given the agency's failure to acknowledge the nature of the decision-making process that was actually going on, the declaration did little to provide "context or insight into the specific decision-making processes or deliberations at issue, and how they in particular would be harmed by disclosure" of the contested records.  *See Judicial Watch, Inc.*, 2019 WL 4644029, at *5.

Brinkmann Decl. ¶ 16.[17]

The Colborn declaration avers:

> All of the documents at issue are also protected by the attorney-client privilege. The documents were prepared or revised by OLC attorneys in the course of carrying out OLC's role of legal adviser to the Attorney General and the Department of Justice. *See* 25 C.F.R. § 0.25(c) (it is OLC's responsibility to provide "opinions to the Attorney General and to the heads of the various organizational units of the Department on questions of law arising in the administration of the Department"). In that capacity, OLC attorneys maintain an attorney-client relationship with the Attorney General and other officials requiring legal advice from OLC, similar to the attorney-client relationship that the lawyers in the Office of General Counsel of any other agency have with the agency head and other officials. The factual material provided to OLC in this capacity is provided for purposes of developing this confidential legal advice. Having been asked to provide legal advice, OLC attorneys stood in a special relationship of trust with the Attorney General and his staff, as well as other Department officials. Just as disclosure of client confidences in the course of seeking legal advice would seriously disrupt the relationship of trust so critical when attorneys formulate legal advice to their clients, so too would disclosure of the legal advice itself undermine that trust.

Colborn Decl. ¶ 22.

The declarants emphasize that the OLC plays the unique role of "lawyers' lawyer" within the Department of Justice and the executive branch as a whole, and the Court of Appeals has acknowledged that those lawyers can be differentiated from other government employees with law degrees. *See, e.g.*, *CREW v. U.S. Dep't of Justice,* 846 F. 3d 1235, 1238 (D.C. Cir. 2017) ("For decades, [OLC] has been the most significant centralized source of legal advice within the

---

17    Plaintiff resists the application of the attorney-client privilege for reasons similar to the objections it raised with respect to the deliberative process privilege. "[T]he March 24 memo was not prepared for the purpose of providing legal advice on the sufficiency of the evidence in the Special Counsel Report to support prosecuting the President for obstruction of justice, as DOJ claims . . . . To the contrary, that decision, entrusted to the Special Counsel, already had been made and left undisturbed by the Attorney General." Pl.'s Mem. at 19. According to CREW, "OLC's views were instead sought to assist Attorney General Barr in making a political or strategic decision about how to 'spin' the report in a way that placed President Trump in the best light possible, while undermining any contrary conclusion the Special Counsel had reached." *Id.*

Executive Branch . . . .   Indeed, executive-branch officials seek OLC's opinion on some of the weightiest matters in our public life.") (internal quotations omitted).   Other courts in this district have therefore recognized, based on similar declarations, that OLC opinions may be protected by the attorney-client privilege.   *See, e.g.*, *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 196 (D.D.C. 2013); *CREW v. U.S. Dep't of Just.*, 298 F. Supp. 3d 151, 155 (D.D.C. 2018).   But it is a decision to be made on a case-by-case basis, and all of the prerequisites for the applicability of the privilege must be established.   *CREW v. Off. of Admin.,* 249 F.R.D. 1, 4 (D.D.C. 2008) (holding that because an OLC memorandum did not rest upon confidential information obtained from the agency involved, but rather, basic factual information, it was not covered by the attorney-client privilege, even though it was appropriately withheld under the deliberative process privilege).

Given the fact that the review of the document *in camera* reveals that there was no decision actually being made as to whether the then-President should be prosecuted, ██████████████ ████████████████████████████████████████ the Court is not persuaded that the agency has met its burden to demonstrate that the memorandum was transmitted for the purpose of providing legal advice, as opposed to the strategic and policy advice that falls outside the scope of the privilege.   Section I of the memo, which was entirely redacted with no separate justification, contains no legal advice at all, but it offers only strategic ███████████████ advice, so this explanation is entirely deficient to justify the withholding of that portion of the document.

Section II is a blend of legal and strategic advice prepared, at least in part, and reviewed in its entirety, by an attorney within the OLC.   However, since the memorandum was being written at the same time and by the same people who were drafting the Attorney General's letter to Congress setting forth his views on the basis for a prosecution, and the record reflects that the

priority was to get the letter completed *first*, *see* Attachment 1, one simply cannot credit the declarant's statement that the Attorney General made the "decision" he announced based on the advice the memo contains.  Brinkmann states:

> The material that has been withheld within this memorandum consists of OLC's and the PADAG's candid analysis and legal advice to the Attorney General, which was provided to the Attorney General prior to his final decision on the matter.

Brinkmann Decl. ¶ 11; *see also* Def.'s Mem. at 14 (The document contains "candid analysis and advice provided to the Attorney General prior to his final decision on the issue addressed in the memorandum – whether the facts recited in Volume II of the Special Counsel's Report would support initiating or declining the prosecution of the President.") (internal quotations omitted). Along with the redacted portions of the memorandum, the chronology undermines the assertion that the authors were engaged in providing their legal advice in connection with any sort of pending prosecutorial decision, and this misrepresentation, combined with the lack of candor about what any legal advice provided was for or about, frees the Court from the deference that is ordinarily accorded to agency declarations in FOIA cases.[18]

There are also other problems with the agency's showing.

While the memorandum was crafted to be "from" Steven Engel in OLC, whom the declarant has sufficiently explained was acting as a legal advisor to the Department at the time, it also is transmitted "from" Edward O'Callaghan, identified as the Principal Associate Deputy Attorney General.  The declarants do not assert that his job description included providing legal

---

18      There is no need for the Court to determine what its ruling would have been had the agency candidly informed it that the purpose of the document ████████████████ ████████████████████████████████████████████████████ It is the government's burden to support its withholdings.

advice to the Attorney General or to anyone else; Colborn does not mention him at all, and Brinkmann simply posits, without reference to any source for this information, that the memo "contains OLC's and the PADAG's legal analysis and advice solicited by the Attorney General and shared in the course of providing confidential legal advice to the Attorney General." Brinkmann Decl. ¶ 16.[19]

The declarations are also silent about the roles played by the others who were equally involved in the creation and revision of the memo that would support the assessment they had already decided would be announced in the letter to Congress.  They include the Attorney General's own Chief of Staff and the Deputy Attorney General himself, *see* Attachment 1, and there has been no effort made to apply the unique set of requirements that pertain when asserting the attorney-client privilege over communications by government lawyers to them.  Therefore, even though Engel was operating in a legal capacity, and Section II of the memorandum includes legal analysis in its assessment of the strengths and weaknesses of the purely hypothetical case, the agency has not met its burden to establish that the second portion of the memo is covered by the attorney-client privilege.

The government's failure to meet its burden to establish the legal grounds for its invocation of the two privileges asserted means that the record must be produced.  *See Schiller*, 964 F.2d at 1209 (D.C. Cir. 1992) (when courts conduct *in camera* review and find that the claimed FOIA exemptions were improper, the proper remedy is to order their disclosure); *see also Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 905 F. Supp. 2d 206 (D.D.C. 2012) (ordering

---

19    The government's memorandum adds that "PADAG O'Callaghan had been directly involved in supervising the Special Counsel's investigation and related prosecutorial decisions," Def.'s Mem. at 14, but that does not supply the information needed to enable the Court to differentiate among the many people with law degrees working on the matter.

disclosure of documents after *in camera* review demonstrated documents were improperly withheld).

The Court emphasizes that its decision turns upon the application of well-settled legal principles to a unique set of circumstances that include the misleading and incomplete explanations offered by the agency, the contemporaneous materials in the record, and the variance between the Special Counsel's report and the Attorney General's summary. This opinion does not purport to question or weaken the protections provided by Exemption 5 or the deliberative process and attorney-client privileges; both remain available to be asserted by government agencies – based on forthright and accurate factual showings – in the future.

## COUNT TWO

Defendant asks the Court to dismiss Count Two for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Def.'s Mem. at 23–26.

FOIA specifically provides that "[a] district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request." 5 U.S.C. § 552(a)(6)(E)(iv). The declarations establish that the responses provided to plaintiff on May 22, 2020, by OLC, and on June 17, 2020, by OIP constitute a complete response to the request as it was narrowed by agreement of the parties. Therefore, there is nothing further for the Court to adjudicate. *See, e.g.*, *Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 296 (D.D.C. 2013) ("Based on *Edmonds* [*v. FBI*, 417 F.3d 1319, 1323–24 (D.C. Cir. 2005)] . . . an important question to ask in determining whether a requester's claim regarding the denial of a request for expedited processing is moot is what relief the requester still has available if the denial is deemed incorrect.").

CREW does not dispute this.  It acknowledges in its opposition to the motion that while it was denied the benefit of the expedition that it requested, "[u]nfortunately, the FOIA provides no remedy for stale information."  Pl.'s Mem. at 21.  It concludes that therefore, "the Court need not rule on DOJ's renewed motion to dismiss."  *Id.*  It is not entirely clear what "not ruling" means, particularly in light of CREW's apparent concession that there is no role for the Court to play.  But in its reply, CREW raised the specter of future unsupported denials of requests for expedition, and it urged the Court to "make clear that the reasoning of its earlier opinion denying DOJ's motion to dismiss accurately states the law on exhaustion and that DOJ still has not offered a 'reasoned decision' to justify denying CREW expedition."  Pl.'s Reply in Supp. of Cross Mot. [Dkt. # 21] ("Pl.'s Reply") at 18.

The FOIA provision divesting this Court of jurisdiction does not provide for the application of the capable of repetition yet evading review exception to mootness, *see Honeywell Intern., Inc., v. Nuclear Regulatory Comm'n.*, 628 F.3d 568, 577 (D.C. Cir. 2010); nor is it clear that the prerequisites have been established.  So the Court finds that Count Two is moot and should be dismissed.  It does not find it necessary to repeat itself to "make clear" that its earlier opinion was "accurate;" that opinion is a matter of record just like this one.

## CONCLUSION

For all of the reasons set forth above, the Court will grant both motions for summary judgment in part and deny them in part.  It will grant defendant's motion and enter judgment in favor of the defendant on Count One with respect to Document 6.  But defendant's motion will be denied, and plaintiff's motion will be granted with respect to Document 15, and DOJ will be ordered to produce the document to CREW.  Defendant's renewed motion to dismiss Count Two will be granted, and the claim will be dismissed.

Defendant must file any motion to stay by May 17, 2021, and it must inform the Court of its position on whether this order may be unsealed at that time.



AMY BERMAN JACKSON
United States District Judge

DATE: May 3, 2021

*Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, 19-cv-1552

**ATTACHMENT 1**

**Summary of Emails Contained in Exhibit A to Plaintiff's Opposition to Defendant's Motion for Summary Judgment [Dkt. # 16-1] and Plaintiff's Cross Motion for Summary Judgment [Dkt. # 17-2]**

Participants in the communications include: Stephen A. Engel, Assistant Attorney General, Office of Legal Counsel (OLC); Brian C. Rabbitt, Chief of Staff, Office of the Attorney General (OAG);[1] Rod Rosenstein, the Deputy Attorney General; Edward C. O'Callaghan, Principal Associate Deputy Attorney General, Office of the Deputy Attorney General (ODAG); and Henry C. Whitaker (OLC).

| Emails re: 3/24/19 letter to Congress | General emails (topic not specified) | Emails re: 3/24/19 memo to AG Barr |
|---|---|---|
| **3/22/19 8:36 pm:** Engel (OLC) to Rabbitt (OAG) re: "draft letter" with attachment: "2019.03.23 SC Second Notification DRAFT 3-22 2030.docx"<br><br>Engel emails "Here's the latest."  Ex. A to Pl.'s Cross Mot. [Dkt. # 17-2] at 7.[2] | | |
| | **3/22/19 7:01 pm:** Rabbitt (OAG) emails "The AG and I plan to be here tomorrow" and the likely arrival time; Rosenstein (ODAG) replies that he'll be there.  pp. 8–9. | |

---

1    In communications from January 2019 that were included in the materials released to plaintiff and provided to the Court as plaintiff's Exhibit A, Rabbitt's assignment was identified as "OLP."  The January emails are not included in this chronology since it does not appear that the letter being discussed on January 13, 2019 is the same document as the March 24 letter at issue here.  As of March 22, 2019, when the relevant communications begin, Rabbitt's location is identified as "OAG." This chronology also does not include emails contained in Exhibit A that post-date the completion of the memorandum at issue.

2    Page numbers refer to the CM/ECF numbers in Exhibit A to Plaintiff's Cross Motion for Summary Judgment.  [Dkt. # 17-2].  Subsequent references will simply state the page.

| | | |
|---|---|---|
| | **3/23/19 10:18 am:** Rabbitt to Rosenstein, cc: Engel, advising, "The AG, Steve and I are here." p. 8. | |
| **3/23/19 10:18 am:** Rosenstein writes, "We are working on a draft letter." p. 8. | | |
| **3/23/19 10:30 am:** Rabbit to Rosenstein, cc: Engel and O'Callaghan (ODAG): "I understand Steve is as well, so we may want to coordinate." p. 8. | | |
| | **3/23/19 10:31 am:** Rosenstein responds: "[Redacted], but how about meeting with the AG at 10:45 to discuss process." p. 8. | |
| | **3/23/19 10:34 am:** Rabbitt to Rosenstein, cc: Engel and O'Callaghan: "Great. We're working in the AG's conference room." p. 8. | |
| **3/23/19 12:13 pm:** Engel emails Rabbitt with attachment: "2019.03.23 Second Notification DRAFT 3-23 1000.docx." p. 8. | | |
| | | **3/23/19 7:52 pm:** Engel emails Rosenstein, Rabbitt, O'Callaghan, Whitaker (OLC), re: "draft memo" with attachment: "AG Memo 3-23 1730.docx"<br><br>"Attached is the current draft of the memo. I'll probably take another pass and recirculate . . . . But for those with time and interest to keep going now, feel free to take a pass." p. 10. |

| | | |
|---|---|---|
| | | **3/23/19 11:44 pm:** Rabbitt to Rosenstein, O'Callaghan, Whitaker, and Engel transmits draft: "[T]houghts and comments in the attached." p. 11.[3] |
| | | **3/24/19 1:34 am:** Rosenstein to Rabbitt, O'Callaghan, Whitaker, and Engel, transmitting proposed edits on multiple pages. pp. 11–12.[4] |
| | | **3/24/19 12:58 pm:** Engel emails Rosenstein, Rabbitt, O'Callaghan, Whitaker, re: "draft memo" with attachment: "AG Memo 3-24 1300.docx"

"Attached is latest draft. This should include all of the edits received to date . . . . [I]n the interest of time, thought it ripe to recirculate." p. 13. |
| | | **3/24/19 1:01 pm:** Engel sends Rabbitt "the new paragraph." pp. 15–16. |
| | | **3/24/19 1:03 pm:** Rabbitt asks Engel: "For the memo, not the letter, correct?" p. 15. |
| | | **3/24/19 1:10 pm:** Engel responds to Rabbitt: "correct[.]" p. 15. |
| | | **3/24/19 1:40 pm:** Rosenstein sends email to Engel, Rabbitt, cc: O'Callaghan, Whitaker, re: "draft memo" saying "Proposed edits." p. 18. |
| | | **3/24/19 1:52 pm:** Engel responds to all with edits: "[Redacted]. What do you think about this: [redacted]." p. 18. |

---

3      The addressee line is not included, but it can be inferred from Engel's response ("Thanks!") to Rosenstein's message on March 24, 2019, at 1:34 am, responding to Rabbitt. p. 11.

4      The addressee line is not included, but it can be inferred from Engel's response ("Thanks!") to this message on March 24, 2019, at 7:57 am. p. 11.

| | | |
|---|---|---|
| | | **3/24/19 1:59 pm:** Rosenstein's reply-all is redacted in its entirety.  pp. 17–18. |
| | | **3/24/19 2:03 pm:** Engel's reply-all: "I take the point [redacted]."  p. 17. |
| | | **3/24/19 2:08 pm:** Rosenstein's reply-all is redacted in its entirety.  p. 17. |
| | | **3/24/19 2:09 pm:** Engel's reply-all: "done[.]"  p. 17. |
| **3/24/19 1:51 pm:** Rabbitt to O'Callaghan, Engel, Rosenstein, Whitaker re: "Draft Letter":  "Proposed final draft attached. Please review ASAP and respond with edits."  p. 22. | | |
| **3/24/19 2:05 pm:** Rosenstein's reply-all transmits a redacted edit for page 2.  p. 22. | | |
| **3/24/19 2:08 pm:** Rabbitt's reply-all: "Done."  pp.  21–22. | | |
| **3/24/19 2:11 pm:** Engel's reply-all transmits a redacted edit for page 1.  p. 21. | | |
| **3/24/19 2:16 pm:** Rabbitt's reply-all: "We need to go final at 2:25."  p. 21. | | |
| **3/24/19 2:17 pm:** Rosenstein's reply-all: "Let's meet now to review the final version."  p. 21. | | |
| | | **3/24/19 2:18 pm:** Engel responds to the Draft Letter chain with attachment: "AG Memo 3-24 1300.docx" "OK.  here's the latest memo, btw, although we presumably don't need to finalize that as soon." p. 21. |

4

| | | |
|---|---|---|
| **3/24/19 2:18 pm:** Rabbitt summons Rosenstein, Engel, O'Callaghan, and Whitaker to meeting at OAG re: "Draft Letter."  p. 24. | | |
| **3/24/19 3:18 pm:** Engel's reply-all: "Attached is the current version and a compare to the prior version." p. 24. | | |
| **3/24/19 3:46 pm:** Rosenstein's reply-all: "Proposed edits attached." pp. 24–25. | | |
| **3/24/19 3:52 pm:** Engel's reply-all: "Revised, with Rod and my edits" and added something of a "quasi-substantive note. [Redacted]." <br><br> "I'm ready to finalize, subject to any remaining edits from others."  p. 23. | | |
| **3/24/19 4:07 pm:** O'Callaghan's reply-all: "Agree with DAG's edits. Some more included."  p. 23. | | |
| **3/24/19 4:13 pm:** Engel's reply-all is redacted in its entirety.  p. 23. | | |
| **3/24/19 4:25 pm:** Engel responds to all on O'Callaghan's 4:07 pm email: "Current draft, and here's he revised [redacted] paragraph. If this looks good, I think we can finalize."  pp. 26–27. | | |
| **3/24/19 4:27 pm:** Engel's reply-all: "tightened" [redacted paragraph]."  p. 26. | | |
| **3/24/19 4:29 pm:** Rosenstein's reply-all: "A few proposed edits attached. How about meeting at 4:45 to finalize?" p. 26. | | |

| | | |
|---|---|---|
| **3/24/19 4:33 pm:** Engel's reply-all:  "OK w me. OAG conference room?" p. 26. | | |
| **3/24/19 4:29 pm:** O'Callaghan responds to all on Engel's 4:27 pm email: "Suggested change [redacted]. Edit this: [redacted] To this: [redacted]."  p. 30. | | |
| **3/24/19 4:31 pm:** O'Callaghan's reply-all is redacted in its entirety.  p. 30. | | |
| **3/24/19 4:36 pm:** Engel's reply-all: "[Redacted] in the letter."  p. 30. | | |
| | | **3/25/19 8:52 am:** Rabbitt emails Engel, Rosenstein, O'Callaghan re: "2019.03.24 – Memorandum to AG from DAG re Mueller Report Review.pdf": "All – For your records.  OAG has retained the original and will file through our exec sec process." pp. 35–36.  Subsequent email exchange through 10:59 am concerns changes to incorrect year in date on front page.  p. 35. |