## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | |
| Plaintiff, | |
| v. | Case No. 1:19-cv-1552 (ABJ) |
| U.S. DEPARTMENT OF JUSTICE, | |
| Defendant. | |

## DEFENDANT'S MOTION FOR A PARTIAL STAY PENDING APPEAL AND MEMORANDUM IN SUPPORT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT ...................................................................................................................... 2

STANDARD OF REVIEW .................................................................................................. 3

ARGUMENT ....................................................................................................................... 4

I.    THE GOVERNMENT WILL SUFFER IRREPARABLE INJURY IF A STAY
      IS NOT GRANTED ................................................................................................. 4

II.   AN APPEAL WOULD PRESENT A SERIOUS LEGAL QUESTION ON WHICH
      DOJ IS LIKELY TO SUCCEED ............................................................................. 5

      A.     Section II provided advice in the context of a deliberative process. ............... 6

      B.     Document no. 15 was *pre*-decisional because it was memorializing
             advice provided during the course of a decisionmaking process ..................... 8

      C.     The government's declarations and briefs were accurate and submitted
             in good faith. ..................................................................................................... 12

III.  THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF A STAY ..................... 18

CONCLUSION ................................................................................................................... 19

**INTRODUCTION**

We respectfully seek a stay pending appeal of this Court's order, but only insofar as it requires the release of Section II of Document no. 15—also referred to as the March 2019 Memorandum.  The government has determined not to appeal this Court's decision insofar as it ordered the release of the entirety of the first page of Document no. 15 and Section I of the document.  Accordingly, this Court's memorandum opinion, which discusses those previously redacted portions of the document, may be unsealed in its entirety.

As discussed below, the standards for a stay pending appeal are satisfied here.  The irreparable harm that would be caused by the release of the redacted portions of the document is manifest, as it would render moot the government's appeal and require the release of the deliberative material in Section II of the memorandum.  On the merits, the Court's decision was substantially premised on the view that the government's briefs and declarations incorrectly described the nature of the decisional process in which the Attorney General was engaged.  In retrospect, the government acknowledges that its briefs could have been clearer, and it deeply regrets the confusion that caused.  But the government's counsel and declarants did not intend to mislead the Court, and the government respectfully submits that imprecision in its characterization of the decisional process did not warrant the conclusion that Document no. 15 was unprotected by the deliberative process privilege.  Nor does it warrant the conclusion here that the distinct deliberative material in Section II of that document is unprotected.

Simultaneously with this motion, the government is filing a notice of appeal, as authorized by the Office of the Solicitor General.  In the event that this Court is inclined to deny this motion, the government respectfully requests that this Court make clear that disclosure of Section II is not required before the court of appeals acts on the stay motion that the government intends to prepare

1

and file in that court in the event that this Court denies relief.

## STATEMENT

This Freedom of Information Act (FOIA) case arises out of a FOIA request that plaintiff, Citizens for Responsibility and Ethics in Washington (CREW), submitted to the Office of Legal Counsel (OLC), seeking "all documents pertaining to the views OLC provided Attorney General William Barr on whether the evidence developed by Special Counsel Robert Mueller is sufficient to establish that the President committed an obstruction-of-justice offense." Colborn Decl. (ECF No. 15-3), Ex. B at 1. With its response to plaintiff's request, the Department of Justice (DOJ) released in redacted form the March 2019 Memorandum, a memorandum to the Attorney General from OLC Assistant Attorney General (AAG) Steven Engel and Principal Associate Deputy Attorney General (PADAG) Edward O'Callaghan. Colborn Decl. ¶ 17; Brinkmann Decl. (ECF No. 15-4) ¶¶ 7, 11. DOJ's declarants attested that Document no. 15 memorialized Engel's and O'Callaghan's "candid analysis and legal advice" provided to the Attorney General "prior to his final decision," Brinkmann Decl. ¶ 11, on the central issue addressed in the memorandum: whether the evidence described in the Special Counsel's Report "would support initiating or declining the prosecution of the President for obstruction of justice under the Principles of Federal Prosecution," Colborn Decl. ¶ 17 (quoting Document no. 15 at 1); *see also* 2d Colborn Decl. (ECF No. 19-1) ¶ 9; Brinkmann Decl. ¶¶ 7, 11.

On May 3, 2021, the Court determined that Document no. 15 "is not predecisional, and it may not be withheld under Exemption 5 on the basis of the deliberative process privilege." Mem. Op. (ECF No. 27) (Op.) 28. Accordingly, that same day, the Court ordered DOJ to "produce Document 15 to plaintiff," Order (ECF No. 26) 1, and further directed that DOJ "must file any motion to stay this order by May 17, 2021, and it must inform the Court at that time of its position

on whether the Memorandum Opinion may be unsealed in its entirety."[1]

As noted above, the government has determined not to appeal the Court's decision insofar as it orders the release of the entirety of the first page of Document no. 15 and Section I of the document. A copy of Document no. 15 reflecting that release is attached as Exhibit A. With the release of page 1 and Section I, the sealed portions of the Court's Memorandum Opinion may now be unsealed.

## STANDARD OF REVIEW

A party seeking a stay pending appeal must show that four factors weigh in favor of a stay: "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam). *See also Nken v. Holder*, 556 U.S. 418, 434-435 (2009); *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008).

"A party does not necessarily have to make a strong showing with respect to the first factor (likelihood of success on the merits) if a strong showing is made as to the second factor (likelihood of irreparable harm)." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 83 (D.D.C. 2018) (citing *Cuomo*, 772 F.2d at 974). Furthermore, "courts often recast the likelihood of success factor as requiring only that the movant demonstrate a serious legal question on appeal where the balance of harms strongly favors a stay." *Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 193 n.5 (D.D.C. 2005) (citations omitted); *see also Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 317 F. Supp. 3d 555, 560–61 (D.D.C. 2018) ("[T]he 'sliding scale' framework

---

[1] This Court subsequently extended the deadline to May 24, 2021. May 14, 2021 Minute Order.

allows a movant to remedy a lesser showing of likelihood of success on the merits with a strong

showing as to the other three factors, provided that the issue on appeal presents a 'serious legal

question' on the merits." (quoting *Wash. Area. Metropolitan Transit Comm'n v. Holiday Tours,*

*Inc.*, 559 F.2d 841, 844 (1977)).

## ARGUMENT

### I.   THE GOVERNMENT WILL SUFFER IRREPARABLE INJURY IF A STAY IS NOT GRANTED.

In the absence of a stay, DOJ will immediately be required to disclose Section II of

Document no. 15 prior to having an opportunity to appeal the Court's May 3 Order.   The

irreparable harm that would result is manifest.   Where, as here, an order directs an agency to

produce material that the agency argues is legally exempt from disclosure, compliance with the

order "mak[es] the issue . . . effectively moot."   *In re Sealed Case (Medical Records)*, 381 F.3d

1205, 1210 (D.C. Cir. 2004) (quoting *United States v. Philip Morris Inc.*, 314 F.3d 612, 619 (D.C.

Cir. 2003)).   That is because compliance "let[s] the cat out of the bag, without any effective way

of recapturing it if the district court's directive [is] ultimately found to be erroneous." *Judicial*

*Watch, Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005) (quoting *Irons v. FBI*, 811 F.2d 681, 683

(1st Cir. 1987)).   The government's appeal from the Order thus "will become moot" if DOJ

"surrender[s]" Document no. 15 in its entirety, because the ordered release would cause

"confidentiality [to] be lost for all time[,]" thereby "utterly destroy[ing] the status quo[.]"

*Providence Journal Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979).   The resulting harm to DOJ

would thus be "irreparabl[e]." *Id.*

For that reason, "[p]articularly in the FOIA context, courts have routinely issued stays

where the release of documents would moot a defendant's right to appeal." *People for the Am.*

*Way Found. v. U.S. Dep't of Educ.*, 518 F. Supp. 2d 174, 177 (D.D.C. 2007) (citation omitted);

*see also John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1308-09 (1989) (Marshall, J., in chambers) (staying FOIA disclosure order of lower court pending disposition of certiorari petition where, *inter alia*, "fact that disclosure would moot that part of the [challenged] decision requiring disclosure of the *Vaughn* index would also create an irreparable injury"); *Ctr. for Int'l Envt'l Law v. Office of U.S. Trade Rep.*, 240 F. Supp. 2d 21, 23 (D.D.C. 2003); *Ctr. for Nat'l Sec. Studies v. DOJ*, 217 F. Supp. 2d 58, 58 (D.D.C. 2002).  If the government is required to disclose Section II of Document no. 15, its right to a meaningful appeal will be lost, and the status quo cannot be restored.  The harm from compliance with the Order to produce Section II thus would be both significant and irreparable.

## II.   AN APPEAL WOULD PRESENT A SERIOUS LEGAL QUESTION ON WHICH DOJ IS LIKELY TO SUCCEED.

The government is also likely to succeed on appeal because Section II of Document no. 15 memorializes deliberative and predecisional advice to the Attorney General regarding the substantive question of whether the evidence contained in the Special Counsel's Report would support initiating or declining a prosecution under the Principles of Federal Prosecution.  The Court based its contrary conclusion on the view that the government's briefs and declarations misdescribed the nature of the decisional process in which the Attorney General was engaged, and that a memorandum prepared contemporaneously with a "decision" cannot be "predecisional." But the latter conclusion is contrary to governing law, and the government respectfully submits that the former reflects a misunderstanding of the arguments the government was intending to make.  Those arguments accurately described how the redacted portions of the March 2019 Memorandum were predecisional and deliberative.  And read as a whole, the evidence in the record—which includes the memorandum—demonstrates that Section II of Document no. 15 is covered by the deliberative process privilege because it is both deliberative and predecisional.

5

### A. Section II provided advice in the context of a decisional process.

The Court first held that Document no. 15 could not be accurately described as pre-"decisional" because the Court's "review of the document reveals that the Attorney General was not . . . engaged in making a decision about whether the President should be charged with obstruction of justice" at the relevant time.  Op. 19.[2]  In other words, the Court understood the government's briefs and declarations to be characterizing the decision that the Attorney General was making as a decision whether to actually commence an indictment or prosecution of the President, and further understood that characterization as inconsistent with the memorandum itself. To be clear, the government agrees that the Attorney General was not making a decision about whether to indict or prosecute, and we regret language that was imprecise in the government's brief and the confusion it has caused.  Rather, the declarations and briefs on the whole made clear that the decision in question was whether the facts articulated by Volume II of the Special Counsel's Report were sufficient to establish that the President had committed obstruction of justice, *i.e.,* whether the facts constituted prosecutable conduct under the Principles of Federal Prosecution.  *Compare* Colborn Decl. ¶ 17 *with* Op. 24.

 While a decision whether to actually commence a prosecution, and a decision as to whether the evidence would be sufficient to establish a basis to prosecute, may be closely related, and while both involve assessments that are "prosecutorial" in nature, they are not one and the same.  The Attorney General could seek advice on and decide whether the conduct in question met the legal standard for an offense and DOJ standards for bringing a prosecution under the Principles of Federal Prosecution, notwithstanding that an actual criminal prosecution was foreclosed by the

---

[2] The Court already found that DOJ satisfactorily demonstrated that Document no. 15 is deliberative.  *See* Op. 17.

prior OLC opinion. And because the existence of the OLC opinion foreclosing prosecution was widely known and acknowledged in both the Mueller Report and Attorney General Barr's contemporaneous letter to Congress, the government had no reason to suggest (and certainly did not mean to suggest) that a decision whether to bring an actual criminal prosecution was in play. Accordingly, given the decision the Attorney General was making—whether the facts constituted an offense that would warrant prosecution—the decisional process was privileged, just as it would have been if the Attorney General had been deciding whether to actually commence a prosecution.

Plaintiff contended in its briefing that the Attorney General did not have a genuine decision to make. Pl.'s Mem. in Supp. of Cross-Mot. For Summ. J. (ECF No. 17-1) (Pl.'s Mem.) at 15-16. That is incorrect. The Attorney General was electing to make a decision that was explicitly left open by the Special Counsel: whether, in "a prosecutor's judgment[,] . . . crimes were committed" based on "the conduct [the Special Counsel] investigated under the Justice Manual standards governing prosecution and declination decisions." Special Counsel Robert S. Mueller III, Report on the Investigation into Russian Interference in the 2016 Election, Vol. II, 2 (2019) (Mueller Report, Vol. II), available at https://www.justice.gov/storage/report_volume2.pdf; *see also id.* at 1 (citing *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 222, 260 (2000)). The Attorney General's determination on that point—and on what, if anything, to say to the public about that question—undoubtedly qualifies as a decision, even if it could not have resulted in an actual prosecution of the sitting President. *See* Colborn Decl. ¶ 23. There was no legal bar to determining that the evidence did or did not establish commission of a crime, a determination the Attorney General made and announced.

In refuting the point that the Attorney General had nothing to decide, we did not mean to suggest that the Attorney General was deciding whether to commence an indictment or prosecution

7

of the sitting President.  As plaintiff correctly pointed out, that option was foreclosed for reasons having nothing to do with the allocation of responsibility between the Special Counsel and the Attorney General, based on DOJ's longstanding view that the sitting President was constitutionally immune from prosecution.  We regret that we did not make this distinction clearer in our briefing.  And we trust that the government's release of page 1 and Section I of Document no. 15, which include three references to the constitutional barrier, will dispel any remaining confusion on this point.  Regardless of the constitutional barrier, however, the advice in Section II of the memorandum regarding whether the evidence was sufficient to warrant a prosecution for obstruction of justice contributed to a real decisional process that the deliberative process privilege protects.

### B.  Document no. 15 was *pre*-decisional because it was memorializing advice provided during the course of a decisionmaking process.

The Court additionally held that Document no. 15 was not "pre"-decisional because it was drafted contemporaneously with the preparation of the Attorney General's letter to Congress and was not finalized until after that letter was finalized.  Op. 27.  The government respectfully submits that that holding, based on the Court's review of redacted emails released by DOJ to plaintiff, misapplies the governing law and disregards the government's October 7, 2020 declaration addressing the timing of the decision.

As the Supreme Court recently explained, "[t]o decide whether a document communicates the agency's settled position," as opposed to predecisional deliberations, "courts must consider whether the agency treats the document as its final view on the matter" or whether, instead, the document "leaves agency decisionmakers 'free to change their minds.'"  *Fish & Wildlife Service v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021).  One relevant factor in determining whether a document is predecisional is whether the author possesses the legal authority to decide the matter

at issue. *See, e.g.*, *Electronic Frontier Found. v. DOJ*, 739 F.3d 1, 9 (D.C. Cir. 2014) ("OLC is not authorized to make decisions about the FBI's investigative policy, so the OLC Opinion cannot be an authoritative statement of the agency's policy."). Another is whether the document is directed from a subordinate to a superior official or the opposite. *See, e.g.*, *Brinton v. Department of State*, 636 F.2d 600, 605 (D.C. Cir. 1980) ("'[F]inal opinions[]' . . . typically flow from a superior with policy-making authority to a subordinate who carries out the policy.").

Here, the relevant factors point uniformly to the conclusion that this memorandum contained advice to the Attorney General on a decision; it did not state or memorialize a final decision already reached. Nothing on the face of Document no. 15 suggests that it was memorializing a decision already rendered. To the contrary, the memorandum presented the Attorney General with options to approve or disapprove the recommendation that it offered, and in two places—in the now unredacted portion of the first paragraph on page 1, and on page 5, which DOJ continues to withhold in full—the document makes clear that it reflects advice previously offered to the Attorney General. And the predecisional nature of the advice memorialized in Document no. 15 is confirmed by the two declarations of Paul P. Colborn. The first states that the memorandum "was provided prior to the Attorney General's decision in the matter" and contained "advice and analysis supporting a recommendation regarding the decision he was considering." Colborn Decl. ¶ 21. The second declaration clarifies that Document no. 15 itself was not presented to or signed by the Attorney General until after the March 24 letter was sent to Members of Congress. But the second declaration also explains "that prior to making his decision and sending the letter, the Attorney General had received the substance of the advice contained in [the memorandum] and reviewed multiple drafts of that memorandum," and that "[t]he substance of the advice contained in [the memorandum] did not change in any material way

between the time when the Attorney General last received a draft of the memorandum and the time the Attorney General initialed the approval box on the signed final form of the memorandum." 2d Colborn Decl. ¶ 9.

The Court's holding that Document no. 15 was not predecisional relies exclusively on the timing of that memorandum's preparation relative to the preparation of the letter to Congress. Op. 26-28. But it is not unusual, particularly in a matter being handled in expedited fashion, for a recommendation memorandum to be prepared contemporaneously with the document that carries out the decision. And such memoranda can retain their predecisional character even when they are finalized after the decision in question. The purpose of the deliberative process privilege is to protect "the ingredients of the decisionmaking process," as distinct from "communications made after the decision and designed to explain it." *Sears*, 421 U.S. at 151-152. And a document memorializing "the ingredients of the decisionmaking process" does not become post-decisional simply because it is finalized once the process has concluded. *See, e.g.*, *Mead Data Central, Inc. v. Dep't of the Air Force*, 566 F.2d 242, 257 (D.C. Cir. 1977) ("It would exalt form over substance to exempt documents in which staff recommend certain action or offer their opinions on given issues but require disclosure of documents which only 'report' what those recommendations and opinions are."); *New York Times Co. v. Off. of Mgmt. & Budget*, No. CV 19-3562 (ABJ), 2021 WL 1329025, at *6 (D.D.C. Mar. 29, 2021) ("Chronology is not the beginning and end of the inquiry . . . ; the Court of Appeals [has] recognized that 'documents dated after [the decision at issue] may still be predecisional and deliberative with respect to other, nonfinal agency policies.'" (quoting *Judicial Watch, Inc. v. FDA*, 449 F.3d 141 (D.C. Cir. 2006), and citing *Mead Data Ctr.*, 566 F.2d at 256)); *CREW v. DOJ*, 658 F. Supp. 2d 217, 234 (D.D.C. 2009) ("[T]he information withheld by DOJ recounts the 'ingredients of the decisionmaking process,' and for that reason the information

10

withheld qualifies as predecisional—despite the fact that the interview in which the information was disclosed took place after the decisions were made."); *EPIC v. DHS*, 2006 WL 6870435, at *7-8 (D.D.C. Dec. 22, 2006) (similar).

Here, as discussed above, the Colborn declarations establish that Document no. 15 reflected and summarized advice given to the Attorney General before he decided what to write to Congress. The Second Colborn Declaration explains the chronology:

> I stated in my prior declaration that "[f]ollowing receipt of the memorandum, the Attorney General announced his decision publicly in a letter to the House and Senate Judiciary Committees." [citation omitted] I have recently been informed that prior to making his decision and sending the letter, the Attorney General had received the substance of the advice contained in Document No. 15 [that is, the Memorandum] and reviewed multiple drafts of that memorandum, but the memorandum in fact was put into the signed final form of Document No. 15, and its approval box initialed by the Attorney General, about two hours after the Attorney General sent the letter to the House and Senate Judiciary Committees. The substance of the advice contained in Document No. 15 did not change in any material way between the time when the Attorney General last received a draft of the memorandum and the time the Attorney General initialed the approval box on the signed final form of the memorandum.

2d Colborn Declaration ¶ 9.

Nor would the predecisional character of a recommendation memorandum change even if drafted to support an anticipated outcome.  Often, for example, a decisionmaker may give a preliminary indication of a planned course of action and ask for a memorandum supporting that course of action.  But the memorandum retains its predecisional character as long as the decision could be informed by the memorandum.  In such a circumstance, the memorandum imposes additional discipline on the process, requiring a full written analysis of the reasons for and against the action, and the decisionmaker retains the discretion to change the decision based on considerations discovered during the process of writing or reviewing the memorandum.  The process is not dissimilar to that of a judge who reaches a preliminary conclusion about how to rule

in a given case and tasks a law clerk to write an opinion supporting that conclusion. The law clerk's draft remains predecisional because the judge, after reading the analysis, can still be persuaded or dissuaded by the analysis and reach a different conclusion.

If anything, the fact that this memorandum was being drafted in parallel with the letter to Congress—as opposed to after the fact—bolsters the view that it reflects "the ingredients of the decisionmaking process," as opposed to documenting a consummated decision. Regardless of exactly when the memorandum was finalized, it was generated while the deliberative process was ongoing, its substance was provided to the Attorney General prior to his making a decision, and the memorandum was presented to the Attorney General (in near-final though not final form) at the time that he was still making a final decision. For all of these reasons, the Court was incorrect to conclude that Document no. 15 was not "pre"-decisional.

### C. The government's declarations and briefs were accurate and submitted in good faith.

As described above, Document no. 15 is privileged on its face. The Court nevertheless concluded that inaccuracies in the descriptions of the document in the government's declarations and briefs vitiated application of the privilege. But the government's declarations and briefs accurately characterized the deliberative and predecisional nature of the document.

The declarations and briefs first accurately described the decisional process underlying the final conclusion. As the first part of the first sentence of the memorandum, which was unredacted when the memorandum was originally released, and the now unredacted remaining material on page 1 of Document no. 15 show, the decision on which the memorandum was advising the Attorney General was whether the evidence in Volume II of the Special Counsel's Report was sufficient to establish that the President had committed obstruction of justice. *See* Ex. A at 1. None of the three submitted declarations stated that the Attorney General was deciding whether to

12

actually commence an indictment or prosecution of the President.  The Declaration of Vanessa R. Brinkmann explained that Document no. 15 "was provided to aid in the Attorney General's decision-making process as it relate[d] to the findings of the [Special Counsel's Office (SCO)] investigation, and specifically as it relate[d] to whether the evidence developed by SCO's investigation [was] sufficient to establish that the President *committed* an obstruction-of-justice offense," Brinkmann Decl. ¶ 11 (emphasis added)—not whether he should be *indicted for* such an offense.  The Brinkmann declaration went on to explain that that "legal question" was one that the Mueller Report "did not resolve."  *Id.* at ¶ 11.  The Mueller Report was not silent on the question of whether the President should actually be *prosecuted*; the Special Counsel took that question to be settled by longstanding DOJ precedent that "a sitting President may not be prosecuted."  Mueller Report, Vol. II, at 1 (citing 24 Op. O.L.C. at 222, 257, 260).  Rather, the question the report pointedly "did not resolve" was the one Attorney General Barr answered: whether the facts found by the Special Counsel were sufficient to establish that the President *committed* obstruction of justice.

The first Colborn Declaration likewise explained that Document no. 15 "was submitted to the Attorney General to assist him in determining whether the facts set forth in Volume II of Special Counsel Mueller's report 'would support initiating or declining the prosecution of the President for obstruction of justice under the Principles of Federal Prosecution.'"  Colborn Decl. ¶ 17.  That description quotes from the unredacted portion of the opening sentence of the memorandum and is accurate; it neither states nor necessarily implies that the authors were advising the Attorney General on whether the President should actually be *prosecuted.  See also* Def.'s Mem. in Supp. of Mot. for Summ. J. (Def.'s Mem.) (ECF No. 15-2) 14 (quoting Colborn Decl.).

The declarations and briefing did not state that Document no. 15 took as a given the longstanding DOJ view that the Constitution bars the prosecution of a sitting President.  *See, e.g.*, Op. 19.  But that view was widely known, and documented in the Special Counsel's Report itself, long before the declarations and briefs were filed.[3]  *See* Mueller Report, Vol. II, at 1 (citing 24 Op. O.L.C. at 222, 260).  And the Attorney General's letter to Congress—which was prepared and issued on the same day that Document no. 15 was finalized, Op. 28—explicitly stated that the determination whether the President had committed obstruction "was made without regard to, and [was] not based on, the constitutional considerations that surround the indictment and criminal prosecution of a sitting president."  *See* Letter from William P. Barr, Attorney General, to Hon. Lindsey Graham, Chairman, Committee on the Judiciary, U.S. Senate, *et al.* (Mar. 24, 2019) at 3 (citing 24 Op. O.L.C. 222), available at https://www.justice.gov/archives/ag/page/file/1147981/download.

The government now recognizes, however, that several statements in its briefing, read without the foregoing context—and in light of the redactions from page 1 of the memorandum of the references to the constitutional bar—were susceptible to an interpretation that the Attorney General was considering whether a prosecution or indictment of the sitting President should actually be commenced.  *See* Def.'s Mem. 16 ("Finally, the March 2019 Memorandum contains analysis about whether evidence supports initiating or declining a prosecution. Documents containing deliberations about whether to pursue prosecution are generally protected by the deliberative process privilege." (citing cases)); Def.'s Opp'n to Pl.'s Cross-Mot. for Summ. J. & Reply Mem. in Supp. of Def.'s Mot. for Summ. J. & Renewed Mot. to Dismiss (Def.'s Reply)

---

[3] Indeed, CREW's request specifically sought documents "pertaining to the views OLC provided Attorney General William Barr on whether the evidence developed by Special Counsel Robert Mueller is sufficient to establish that the President committed an obstruction-of-justice offense," Colborn Decl., Ex. B (ECF No. 15-3 at PDF page 19)—a description precisely mirroring the government's description of Document no. 15.

(ECF No. 19) 14 ("Plaintiff's supposition that Document no. 15 'was not part of a deliberation about whether or not to prosecute the President,' Pl.'s Br. 16, cannot overcome the deference to the agency's affidavits."); *id.* at 17 ("Plaintiff has only its misinterpretation of the DOJ special counsel regulations and its own irrelevant speculation, unsupported by admissible evidence, that 'the Attorney General was not seeking legal advice from OLC in order to make a prosecution decision.'").

These passages could have been clearer, and the government regrets that they were not. But they were not intended to convey that the decision to which Document no. 15 related was whether to actually commence a prosecution of the President.  The first statement, like each of the government's declarations—*see, e.g.*, Colborn Decl. ¶ 17; Brinkmann Decl. ¶ 11; 2d Colborn Decl. ¶ 8—describes the relevant decision as "*whether evidence supports* initiating or declining a prosecution."  While it is followed by a statement of the law concerning the applicability of the deliberative process privilege to "[d]ocuments containing deliberations about whether to pursue prosecution," the statement did not say that this memorandum contained such deliberations; it was intended to draw on case law concerning documents memorializing deliberations on whether to actually commence a prosecution.  Although the March 2019 memorandum was not advising on whether to commence a prosecution, it involved an assessment that one could naturally call "prosecutorial" in nature—namely, whether the conduct outlined in the Mueller Report would satisfy the elements of the crime of obstruction and satisfy criteria in DOJ's Principles of Federal Prosecution.  It was not unreasonable, therefore, to cite case law regarding the protection afforded to traditional prosecution memos.

The second and third sentences could have been worded differently to avoid confusion. They were meant to respond to plaintiff's central argument that the Special Counsel regulations

somehow removed from the Attorney General the ability to make *any* relevant decision and to make the point that the government's declarations adequately demonstrated that there was, in fact, a decision on which the Attorney General was receiving advice.  The term "prosecution decision" was a quote from plaintiff's brief, and again, it is natural to describe advice about whether a set of facts does or does not establish the elements of a criminal offense as "prosecutorial" in nature. Notably, the Special Counsel's Report characterized a decision "draw[ing] ultimate conclusions about the President's conduct" as "a traditional prosecutorial judgment."  Mueller Report, Vol. II, at 182.

We further recognize that the potential for confusion was exacerbated by the fact that it was not publicly known at the time of the government's filing that the March 2019 Memorandum itself had discussed the constitutional bar.  The government had released those portions of the memorandum that corresponded to the conclusion to which the Attorney General affixed his signature, which did not mention the constitutional bar, and redacted information not encompassed by the Attorney General's adoption of the recommendation by the OLC AAG and PADAG in the conclusion of the memorandum.  Brinkmann Decl. ¶ 12.  The redactions were made in good faith, and certainly not in an effort to conceal the publicly known proposition that the Department of Justice would not consider indicting a sitting President.  And the presence or absence of the memorandum's references to the constitutional bar does not affect the viability of the government's claim of privilege with regard to Section II of the memorandum, which was accurately described in the government's declarations as discussed above.  With the benefit of hindsight, the government regrets that its declarations and briefs did not state expressly what was clear from the Special Counsel's Report and the Attorney General's letter to Congress—namely, that commencing an actual prosecution of the President was not an option the Attorney General

was considering.  But the omission of that express statement was not meant to suggest—and the declarations and briefs read in full and in context did not suggest—that the Attorney General *was* considering an actual prosecution of the President.

The government's briefs and declarations also did not specifically state that, in addition to addressing whether the evidence was sufficient to establish that the President committed obstruction of justice, Document no. 15 also briefly addressed the antecedent question of whether the Attorney General should make a determination on that point and communicate it publicly in light of the anticipated public release of the Special Counsel's Report.  But the omission of any specific reference to this antecedent question did not serve to mischaracterize the central decisional process that the Attorney General was undertaking concerning the sufficiency of the evidence.  It is not unusual for a memorandum about an issue also to address the antecedent question whether the decisionmaker should resolve the issue or the context in which the issue arises.  The declarations provided support for the predecisional, deliberative nature of the memorandum as a whole, emphasizing the decision that the Attorney General ultimately made rather than the various predicates for making that determination.

Similarly, the declarations and briefing were accurate with respect to the document's predecisional nature.  Indeed, the Second Colborn Declaration explained in detail the sequencing of the deliberations, making clear that the former Attorney General had received the advice in advance of writing the letter to Congress, and signed the written recommendation memorializing the predecisional advice approximately two hours after sending the letter.  *See* 2d Colborn Declaration ¶ 9.  And Document no. 15 itself makes clear in the introduction on page 1 that the issue of whether the evidence was sufficient to establish obstruction of justice had been under consideration for some time in conversations among those in DOJ, including with the Special

17

Counsel, his staff, and the Attorney General.

## III.   THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF A STAY.

A stay pending appeal would not substantially harm plaintiff.  It only "postpones the moment of disclosure[,] assuming [plaintiff] prevails[,] by whatever period of time may be required [] to hear and decide the appeal[]."  *Providence Journal*, 595 F.2d at 890.  The government's decision not to appeal this Court's decision insofar as it requires release of page 1 and Section I of Document no. 15, and the resulting release of those portions of the document, will provide plaintiff and the public with an immediate, clear understanding of the nature and context of the memorandum, and no immediate need exists for public access to the specific analysis contained in Section II of the memorandum.

Public policy also weighs in favor of a stay.  DOJ fully acknowledges the importance of the public interest served by adherence to FOIA.  Nevertheless, Exemption 5 is intended to protect the confidentiality of the government's deliberative process.  *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  That interest will be irrevocably compromised if statutorily exempt material is ordered disclosed before the completion of appellate review.  *See* Brinkmann Decl. ¶ 13.  Issuance of a stay, in contrast, will not harm the public interest.  The most the public stands to lose from the Court granting the instant stay request is a delay until the D.C. Circuit resolves the issue of disclosure.

## CONCLUSION

For the foregoing reasons, this Court should grant defendant's motion for a stay pending appeal as to Section II of Document no. 15.  In addition, with the disclosure of page 1 and Section I of the memorandum, the sealed portions of the Court's opinion may be unsealed.  In the event that this Court denies a stay, it should not require that Section II of Document no. 15 be disclosed

18

until the D.C. Circuit has the opportunity to rule on the stay motion that the government would prepare and file.

Dated: May 24, 2021                              Respectfully submitted,

                                                 BRIAN D. NETTER
                                                 Deputy Assistant Attorney General

                                                 */s/ John R. Griffiths*
                                                 JOHN R. GRIFFITHS (DC Bar  # 449234)
                                                 Director

                                                 */s/ Elizabeth J. Shapiro*
                                                 ELIZABETH J. SHAPIRO (DC Bar # 418925)
                                                 Deputy Director

                                                 */s/ Julie Straus Harris*
                                                 JULIE STRAUS HARRIS (DC Bar # 1021928)
                                                 Senior Trial Counsel
                                                 United States Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 1100 L Street NW, Room 11514
                                                 Washington, D.C. 20005
                                                 Tel: (202) 353-7633
                                                 Fax: (202) 616-8470
                                                 E-mail: julie.strausharris@usdoj.gov

                                                 *Counsel for Defendant*

19